[No. S056734. May 7, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
AIRREQUE PEEVY, Defendant and Appellant.

## COUNSEL

Alemayehu G. Mariam, under appointment by the Supreme Court, for Defendant and Appellant.

Tuttle & Taylor, Mark A. Borenstein, Kate S. Gold, Dahni K. Tsuboi, Barbara Bergman, John T. Philipsbron, Charles D. Weisselberg, Michael J. Brennan and Carrie L. Hempel as Amici Curiae on behalf of Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley, Frederick R. Millar, Jr., William M. Wood and Sara Gros-Cloren, Deputy Attorneys General, for Plaintiff and Respondent.

Michael R. Capizzi, District Attorney (Orange), Wallace J. Wade, Assistant District Attorney, Kent S. Scheidegger and Charles L. Hobson as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

GEORGE, C. J.—In order to protect the exercise of the privilege against self-incrimination, the United States Supreme Court has declared that persons subject to custodial interrogation must be informed of certain rights, including the right to counsel, and that once such a person invokes the right to counsel, the police must cease interrogation until counsel is provided or

the suspect initiates further contact and makes it clear that he or she wishes to proceed without counsel. (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 474 [86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (*Miranda*); *Edwards* v. *Arizona* (1981) 451 U.S. 477, 482, 484-485 [101 S.Ct. 1880, 1883-1884, 1884-1885, 68 L.Ed.2d 378] (*Edwards*); see also *Rhode Island* v. *Innis* (1980) 446 U.S. 291, 293 [100 S.Ct. 1682, 1686, 64 L.Ed.2d 297].)

The United States Supreme Court has decided that a statement taken in violation of these rules is inadmissible at trial in the prosecution's case-in-chief, but is admissible to impeach the defendant's credibility as a witness, so long as the statement otherwise is voluntary. (*Harris* v. *New York* (1971) 401 U.S. 222, 224, 226 [91 S.Ct. 643, 645, 646, 28 L.Ed.2d 1] (*Harris*) [a statement taken without proper *Miranda* advisements may be admitted for impeachment purposes]; *Oregon* v. *Hass* (1975) 420 U.S. 714, 722 [95 S.Ct. 1215, 1220-1221, 43 L.Ed.2d 570] [pursuant to the *Harris* rule, a statement taken after the police fail to honor the suspect's invocation of the right to counsel during interrogation is admissible for impeachment purposes].) Provisions of the California Constitution establish that statements taken in violation of *Miranda* are to be excluded from evidence in this state only to the extent required by the federal Constitution. (Cal. Const., art. I, § 28, subd. (d); *People* v. *May* (1988) 44 Cal.3d 309, 315 [243 Cal.Rptr. 369, 748 P.2d 307].) We are bound, therefore, to apply the rules established in *Harris* and its progeny.

The issue presented in this case is whether the *Harris* rule applies when a police officer conducting a custodial interrogation *deliberately* fails to honor a suspect's request for counsel, with the *objective* of securing evidence for impeachment purposes. We conclude that the *Harris* rule is applicable under these circumstances.

I

At 6:30 a.m. on January 30, 1995, Jack McBrayer collected the receipts from the Kentucky Fried Chicken restaurant he managed in Hesperia, intending to deposit them at a bank. As he entered his truck, he saw the image of two persons reflected in his side-view mirror, and observed that one of the persons was wearing a gorilla mask. McBrayer closed and locked the doors to his truck and turned on the ignition, observing that the person in the gorilla mask, later identified as Joshua Jenkins, as well the other man, later identified as defendant, Airreque Peevy, were attempting to open the doors of the truck. As McBrayer drove out of the parking lot, he saw Jenkins place a gun in the waistband of his trousers. Because his would-be assailants began to walk away from the scene and appeared to be stunned by the turn

of events, McBrayer decided to give chase. He followed defendant until defendant reached his own vehicle and drove off with Jenkins as a passenger. Eventually, McBrayer abandoned the chase. He subsequently provided the police with descriptions of the two men and the license plate number of their vehicle. The police soon detained Jenkins and defendant, and McBrayer identified them. He also recognized Jenkins as an employee of the Kentucky Fried Chicken restaurant in Hesperia, noting that although Jenkins had a shaved head at the time of his arrest, he normally wore long hair. McBrayer also recalled that Jenkins had worked the previous evening, "Super Bowl Sunday," when the restaurant had unusually high receipts.

The police arrested defendant and Jenkins. A search of defendant's vehicle disclosed a gorilla mask, a pair of gloves, and a BB gun.

At the hearing on defendant's *in limine* motion to exclude evidence of statements he made to the police following his arrest, San Bernardino County Deputy Sheriff Douglas Combs testified that he had arrested defendant and advised him of his rights pursuant to *Miranda* at the Hesperia police station. Defendant responded to the *Miranda* advisements by stating that he did not wish to speak.

Thereafter defendant was taken to the office of Detective Dennis Henderson of the San Bernardino Sheriff's Department. Detective Henderson testified that he advised defendant of his rights pursuant to *Miranda*, and defendant responded that "I would rather have an attorney here." Henderson testified that: "I kept talking with him for impeachment purposes . . . . I just continued to talk about the crime." He explained that it was his understanding that "Impeachment is where the defendant gets up on the witness stand and starts telling the court he didn't do it. We can use this. The way I understand it is we can use it against him." Henderson testified that he knew he was violating the dictates of the *Miranda* decision when he continued to talk to defendant. The court sustained the prosecutor's objection to defense counsel's question whether Henderson knew he was violating the law. The court explained that it considered the officer's subjective thought processes to be irrelevant.

Henderson further testified that, in the conversation following defendant's request for counsel, Henderson asked defendant why he was at the Kentucky Fried Chicken restaurant in Hesperia. Defendant replied that he knew they were there for the money. Henderson's interrogation lasted only 10 minutes and took place inside Henderson's office at the police station, and Henderson remained 3 feet away from defendant during the interrogation. The officer spoke in a conversational tone, did not use threats or promises, and

did not indicate to defendant that his statements could not be used against him at trial.

Deputy Combs testified that he also was present during this interview. He was aware that Detective Henderson was interviewing defendant for "impeachment purposes."

At the conclusion of this interview, Combs transported defendant to the Victorville jail. During this trip, defendant stated that Jenkins had been involved. Combs reminded defendant that he had refused to speak about the case earlier, and stated he would read him his *Miranda* rights again. Defendant said he understood his rights and wished to talk. He stated that he had been contacted by Jenkins, that Jenkins told him the manager of the Kentucky Fried Chicken restaurant was giving Jenkins and other employees a hard time, and that Jenkins had solicited defendant's assistance.

The trial court determined that the police had interrogated defendant in deliberate violation of his rights under *Miranda*. The court found that when Detective Henderson continued to question defendant despite his invocation of the right to counsel, this circumstance did not render defendant's statement to Henderson involuntary. Accordingly, the court ruled that the statement could be used for impeachment purposes. The court found, however, that the subsequent interrogation, in which defendant was informed of his *Miranda* rights for the third time, was "abusive," and the court prohibited the use, for any purpose, of defendant's statements to Deputy Combs after the third *Miranda* advisement.

At trial, in addition to the testimony provided by McBrayer regarding the circumstances of the crime, one Lewis Calandrino, an acquaintance of both defendant and Jenkins, testified for the prosecution that he had seen both men in possession of a gun similar to the one found in defendant's vehicle. Calandrino also stated that defendant had telephoned him after being arrested. When Calandrino chided defendant, stating that he was too smart to have been involved in the incident, defendant responded that he was supposed to have been only the driver.

Defendant testified in his own defense, claiming that Jenkins, a juvenile with whom he barely was acquainted, had asked him to participate in frightening McBrayer in revenge for McBrayer's poor treatment of the restaurant's employees. Defendant testified that there had been no plan to rob McBrayer. Defendant testified that he had feigned willingness to participate in the attempt to frighten McBrayer, because defendant desired to have revenge upon Jenkins by leaving Jenkins "in the lurch" at the scene. Defendant testified that he and Jenkins hid in the bushes outside the Kentucky Fried

Chicken restaurant, and that when Jenkins emerged and accosted McBrayer, defendant turned and headed toward his own vehicle. Defendant denied telling investigating officers that he knew he was at the Kentucky Fried Chicken restaurant parking lot with Jenkins "for the money."

In rebuttal, Detective Henderson testified that he interviewed defendant after his arrest, that he advised defendant of his rights, and that defendant stated he wished the services of an attorney. Despite this request, Henderson asked defendant whether he knew why he and Jenkins were at the Kentucky Fried Chicken restaurant in Hesperia. Defendant stated that they were there for the money.

In surrebuttal, defendant denied making any statement after invoking his right to counsel.

The jury convicted defendant of attempted second degree robbery, and he was sentenced to the middle term of two years in state prison. On appeal, defendant contended that the trial court erred in admitting into evidence in rebuttal defendant's statement to Detective Henderson. The Court of Appeal, although it expressed concern at the action of two officers in deliberately violating a suspect's rights under *Miranda*, determined that it was bound to uphold the trial court's judgment under United States Supreme Court authority holding that a statement taken in violation of *Miranda* may be used for impeachment purposes.

## II

### A

In *Miranda, supra*, 384 U.S. 436, the United States Supreme Court established safeguards intended to protect the exercise of the Fifth Amendment privilege against self-incrimination by persons undergoing custodial interrogation. The court expressed concern that the use of psychologically coercive interrogation techniques, as well as the inherently coercive effect of incommunicado interrogation, would, in the absence of adequate safeguards, cause persons undergoing interrogation to incriminate themselves involuntarily. (*Id.* at pp. 448, 455-458, 467 [86 S.Ct. at pp. 1614, 1617-1619, 1624].) Accordingly, the high court held that police officers conducting custodial interrogations must warn suspects regarding certain constitutional rights, including the right to remain silent and the right to counsel. (*Id.* at p. 444 [86 S.Ct. at p. 1612].) The court determined that suspects undergoing custodial interrogation have a right to the assistance of counsel if they so desire, reasoning that the presence of counsel would dispel the coercion inherent in

certain forms of interrogation, and would ensure that any waiver of the privilege against self-incrimination is knowing and voluntary. (*Id.* at pp. 469-470 [86 S.Ct. at pp. 1625-1626].)

The court also held that police officers must cease interrogating any suspect who invokes the right to remain silent or who requests the assistance of counsel. It declared: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the *interrogation must cease. . . .* If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, *they must respect his decision to remain silent.*" (*Miranda, supra,* 384 U.S. at pp. 473-474 [86 S.Ct. at pp. 1627-1628], italics added.)

Finally, the court declared that the prosecution must demonstrate that a defendant who makes a statement in the absence of counsel knowingly and intelligently has waived the privilege against self-incrimination and the right to counsel. Without a proper warning and proof of waiver, "no evidence obtained as a result of interrogation can be used against [the defendant]." (*Miranda, supra,* 384 U.S. at p. 479 [86 S.Ct. at p. 1630].)

In a subsequent case, the court confirmed that once a suspect invokes the right to counsel, interrogation must cease until counsel is provided or the suspect makes it clear that he or she has decided to proceed without counsel. (*Edwards, supra,* 451 U.S. at pp. 482, 484-485 [101 S.Ct. at pp. 1883-1884, 1884-1885].) The court declared: "It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right . . . ." (*Id.* at p. 482 [101 S.Ct. at p. 1884].) Even though a confession may be voluntary, it still may be the case that the accused did not knowingly and voluntarily waive the right to counsel. (*Id.* at p. 484 [101 S.Ct. at pp. 1884-1885].) The court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation . . . . We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485 [101 S.Ct. at pp. 1884-1885].) The protection afforded by this rule

is " 'designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights' " (*Davis* v. *United States* (1994) 512 U.S. 452, 458 [114 S.Ct. 2350, 2355, 129 L.Ed.2d 362]), but " '[i]t remains clear, however, that this prohibition on further questioning—like other aspects of *Miranda*—is not itself required by the Fifth Amendment's prohibition on coerced confessions, but is instead justified only by reference to its prophylactic purpose.' " (*Ibid.*)

Although it firmly has directed that police officers must honor a suspect's invocation of the right to counsel during custodial interrogation by ceasing questioning until counsel is provided or the suspect reinitiates contact, the high court has not required trial courts to exclude evidence of statements taken in violation of *Edwards* when that evidence is not offered in the prosecution's case-in-chief, but rather is offered to impeach the defendant's credibility as a witness. (*Oregon* v. *Hass, supra,* 420 U.S. at p. 722 [95 S.Ct. at pp. 1220-1221] [failure to honor invocation of right to counsel]; *Harris, supra,* 401 U.S. at pp. 224-225 [91 S.Ct. at pp. 645-646] [failure to warn suspect of right to counsel before interrogation].) Statements that are involuntary, of course, remain inadmissible for any purpose. (*Mincey* v. *Arizona* (1978) 437 U.S. 385, 398 [98 S.Ct. 2408, 2416-2417, 57 L.Ed.2d 290].)

In reaching the conclusion that statements taken in violation of *Miranda* are admissible for purposes of impeachment, the court explained in *Harris, supra,* 401 U.S. 222 (a case in which the police failed to advise the suspect of his right to counsel), that although "*Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel" (*id.* at p. 224 [91 S.Ct. at p. 645]), "[i]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." (*Ibid.*) The high court relied on Fourth Amendment principles that it found analogous, stating: " 'It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " (*Ibid.*) The court, pointing out that the accused in *Harris* had testified inconsistently with his earlier statement to the police, observed: "The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the *speculative possibility* that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the

evidence in question is made unavailable to the prosecution in its case in chief." (*Id.* at p. 225 [91 S.Ct. at p. 645], italics added.) The court held that the impeachment evidence properly was admitted, observing: "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Id.* at p. 226 [91 S.Ct. at p. 646].)

In later cases, the court described its analysis in *Harris* as having struck a balance between the need to deter police misconduct and the need to expose defendants who perjure themselves at trial. (*Oregon* v. *Hass*, *supra*, 420 U.S. at p. 723 [95 S.Ct. at p. 1221]; see also *Michigan* v. *Harvey* (1990) 494 U.S. 344, 351 [110 S.Ct. 1176, 1181, 108 L.Ed.2d 293] [declaring that the " 'search for truth' " outweighs the " 'speculative possibility' " that excluding statements for impeachment purposes would deter future police misconduct in violating *Miranda*].) In *Oregon* v. *Hass*, *supra*, 420 U.S. 714, the court concluded that it was appropriate to permit the defendant to be impeached with statements he made to the police after they failed to honor his request for counsel. The court declared that as in *Harris*, the benefit to the jury in evaluating the defendant's credibility in light of the impeachment evidence should not be lost, and that assuming the exclusionary rule has the effect of deterring police misconduct, "there is sufficient deterrence when the evidence in question is made unavailable to the prosecution in its case in chief." (*Id.* at p. 722 [95 S.Ct. at p. 1221].)

The court stated, as it had in *Harris*: "Here, too, the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." (*Oregon* v. *Hass*, *supra*, 420 U.S. at p. 722 [95 S.Ct. at p. 1221].) The court acknowledged a factual distinction between *Harris* and the case before it—in *Harris*, the *Miranda* warnings were defective, while in *Hass* they were proper. Although the police officers in *Hass* ignored the accused's invocation of his right to counsel, this distinction did not afford a basis for a different rule. The court explained: "The deterrence of the exclusionary rule, of course, lies in the necessity to give the warnings. That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in *Harris*, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and to the officer *who is aware of the defect* the full deterrence remains." (*Oregon* v. *Hass*, *supra*, 420 U.S. at p. 723 [95 S.Ct. at p. 1221], italics added.)

The court acknowledged that some officers possibly might take advantage of the *Harris* rule, stating: "One might concede that when proper *Miranda* warnings have been given, and the officer then continues his interrogation

after the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material. This speculative possibility, however, is even greater where the warnings are defective [as in *Harris*] and the defect is not known to the officer. In any event, the balance was struck in *Harris*, and we are not disposed to change it now. If, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." (*Oregon* v. *Hass, supra,* 420 U.S. at p. 723 [95 S.Ct. at p. 1221].)

Finally, in *Michigan* v. *Harvey, supra,* 494 U.S. 344, the United States Supreme Court employed the *Harris* rationale to conclude that a statement taken after police officers failed to honor an arraigned defendant's Sixth Amendment right to counsel could be used for impeachment purposes. The court observed that in the Sixth Amendment context, once a defendant requests counsel the courts presume that, when the police initiate interrogation, any waiver of the Sixth Amendment right is invalid and any ensuing statements are inadmissible in the prosecution's case-in-chief. (See *Michigan* v. *Jackson* (1986) 475 U.S. 625, 636 [106 S.Ct. 1404, 1411, 89 L.Ed.2d 631].) The court held in the *Harvey* case that, nonetheless, the prophylactic rule established in *Michigan* v. *Jackson, supra,* 475 U.S. 625, does not require exclusion of such statements when they are offered for impeachment. Rather, the court emphasized, when the defendant chooses to testify he or she must speak the truth, and may not use the government's misconduct in securing a prior statement as a shield against impeachment. (*Michigan* v. *Harvey, supra,* 494 U.S. at p. 351 [110 S.Ct. at pp. 1180-1181].) The court explained: "We have mandated the exclusion of reliable and probative evidence for *all* purposes only when it is derived from involuntary statements. [Citations.] We have never prevented use by the prosecution of relevant voluntary statements by a defendant, particularly when the violations alleged by a defendant relate only to procedural safeguards that are 'not themselves rights protected by the Constitution,' [citation] but are instead measures designed to ensure that constitutional rights are protected. In such cases, we have decided that the 'search for truth in a criminal case' outweighs the 'speculative possibility' that exclusion of evidence might deter future violations of rules not compelled directly by the Constitution in the first place. *Hass, supra,* at 722-723; *Havens, supra,* at 627 (reaffirming *Hass*). *Hass* was decided 15 years ago, and no new information has come to our attention which should lead us to think otherwise now." (*Michigan* v. *Harvey, supra,* 494 U.S. at pp. 351-352 [110 S.Ct. at p. 1181], original italics.)

Defendant asserts that, despite *Harris* and its progeny, his statement to Detective Henderson should have been excluded even for the purpose of

impeachment, because Detective Henderson purposefully violated the *Edwards* rule (that once a suspect invokes the right to counsel, interrogation must cease) in order to secure evidence to be used for impeachment.[1] Our review of the record clearly reveals that a calculated and purposeful violation of *Edwards* occurred in the present case. The question before us is whether the *Harris* rule applies in such a case.

As already noted, statements taken in violation of *Miranda* are to be excluded from evidence at trial in this state only to the extent required by the United States Constitution. (*People v. May, supra,* 44 Cal.3d at p. 315.) Defendant does not contend otherwise, but asserts that the high court cases establishing that a statement taken in violation of *Miranda* and *Edwards* may be used for impeachment did not involve knowing and deliberate violations such as occurred in his case. No high court authority exists, he urges, to suggest that the *Harris* rule should apply when such a *purposeful* violation has occurred. The *Harris* rule, he asserts, was based upon the assumption that such a knowing and deliberate violation of *Miranda* and *Edwards* would not occur.

Our review of the relevant high court authority indicates that, as the Court of Appeal in the present case concluded, and as the People contend, the *Harris* rule applies even if the individual police officer violates *Miranda* and *Edwards* by purposefully failing to honor a suspect's invocation of his or her right to counsel.

The *Harris* opinion does not disclose whether the interrogating officer in that case purposefully, or only negligently, failed to advise the suspect of the right to counsel. (See *Harris, supra,* 401 U.S. at p. 224 [91 S.Ct. at p. 645].) Nonetheless, the court's declaration that the benefit of the impeachment process "should not be lost . . . because of the speculative possibility that impermissible police conduct will be encouraged thereby" (*id.* at p. 225 [91 S.Ct. at p. 645]), certainly does not suggest that the only impermissible police conduct under consideration in that case was negligent and not purposeful conduct. Rather, as the Court of Appeal observed herein, this language seems to acknowledge the possibility that deliberate police misconduct might be encouraged by a rule permitting the use of a defendant's statement for impeachment purposes. Moreover, the court's concern that police misconduct not become a shield for perjury would seem to apply whether the misconduct is intentional or merely negligent. The court recognized that although illegal police conduct warrants a rule against making use of illegally obtained evidence to build a case against the defendant, such

---

[1]Defendant does not appear to base his argument upon the failure of the interrogating officers to honor his earlier invocation of the right to remain silent.

misconduct does not warrant permitting the defendant to " 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " (*Id.* at p. 224 [91 S.Ct. at p. 645].) This language demonstrates a general disinclination on the part of the high court to view police misconduct as justification for permitting the defendant to commit perjury free from contradiction. The court's emphasis upon the essential truth-finding function of the trial seems applicable whether or not the government misconduct was deliberate. Certainly, the court did not limit its rule to statements that were illegally obtained through mistake or inadvertence.

In addition, the *Miranda* exclusionary rule operates to deter *intentional* police misconduct. (See *Michigan* v. *Tucker* (1974) 417 U.S. 433, 447 [94 S.Ct. 2357, 2365, 41 L.Ed.2d 182] ["The deterrent purpose of the [*Miranda*] exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right."].) The court determined in *Harris* that the goal of deterrence—which necessarily is directed at least in part at intentional misconduct—was served adequately by excluding evidence that otherwise would be part of the prosecution's case-in-chief, but that the assertedly speculative need for further deterrence—again, necessarily against intentional misconduct as well—was *outweighed* by the need to expose perjury through the use of impeachment evidence. The *Harris* rule is based upon this understanding of the function of the *Miranda* exclusionary rule, and it would be anomalous to suppose the court intended that the rule of *Harris* would not apply to intentional misconduct.

We observe that critics of the *Harris* decision certainly have assumed that it would apply in cases of deliberate police misconduct, as the Court of Appeal also observed in the present case. (See *Harris, supra,* 401 U.S. at p. 232 [91 S.Ct. at p. 649] (dis. opn. of Brennan, J.); *Oregon* v. *Hass, supra,* 420 U.S. at p. 725 [95 S.Ct. at p. 1222] (dis. opn. of Brennan, J.); *People* v. *May, supra,* 44 Cal.3d at pp. 333-334 (dis. opn. of Mosk, J.); *People* v. *Disbrow* (1976) 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272]; *id.* at p. 116 (conc. opn. of Wright, C. J.); see also *People* v. *Bradford* (1997) 14 Cal.4th 1005, 1064 [60 Cal.Rptr.2d 225, 929 P.2d 544] (conc. opn. of Mosk, J.); *State* v. *Durepo* (Me. 1984) 472 A.2d 919, 927 (conc. and dis. opn. of Glassman, J.); *State* v. *Miller* (1975) 67 N.J. 229 [337 A.2d 36, 41] (dis. opn. of Pashman, J.); Dershowitz & Ely, *Harris* v. *New York: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority* (1971) 80 Yale L.J. 1198, 1219, fn. 89, 1220, fn. 90.)

Language in *Oregon* v. *Hass, supra,* 420 U.S. 714, and subsequent cases further demonstrates the high court's belief that the *Harris* rule sufficiently

deters individual police misconduct, *whether the misconduct occurred as the result of negligence or design*. In *Oregon* v. *Hass, supra*, 420 U.S. 714, there is some indication that the violation of the suspect's rights was deliberate. In that case, the suspect stated that he wished to speak to an attorney, but the interrogating officer informed him that he would have to wait. (*Id.* at pp. 715-716 [95 S.Ct. at pp. 1217-1218].) The court declared, in concluding that the *Harris* rule applied even though the case involved an *Edwards* violation rather than a failure to give the complete *Miranda* warnings: "That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in *Harris*, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and *to the officer who is aware of the defect the full deterrence remains*." (*Id.* at p. 723 [95 S.Ct. at p. 1221], italics added.) The court proceeded to acknowledge that when the *Harris* rule is applied to an *Edwards* violation, "the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material. This speculative possibility, however, is even greater where the warnings are defective and the defect is not known to the officer. . . ." (*Ibid.*) Having acknowledged the possibility of *both intentional and negligent misconduct* on the part of the police, the court refused to reconsider the balance it had struck in *Harris* between exposing perjury and deterring police misconduct, declaring that cases of abuse by police officers would be dealt with under "traditional standards for evaluating voluntariness and trustworthiness." (*Ibid.*) The quoted language indicates that the court considered it obvious that the *Harris* rule applies regardless of the individual interrogating officer's knowledge that he or she is conducting an interrogation in violation of *Miranda* and *Edwards*, and that an officer's intentional misconduct would require exclusion of the defendant's statements only if they are considered involuntary.[2]

In *Michigan* v. *Harvey, supra*, 494 U.S. 344, it is even more apparent that the interrogating police officer's failure to honor the defendant's Sixth Amendment right to counsel was deliberate. (*Id.* at p. 346 [110 S.Ct. at pp. 1177-1178] [police informed arraigned defendant who was represented by appointed counsel that he did not need to consult with counsel before interrogation].) The United States Supreme Court nonetheless arrived at the same balance it had reached in *Harris*, determining that the value of impeachment to the jury's search for truth outweighed the " 'speculative possibility' " that exclusion of the evidence for impeachment purposes "might

---

[2]We note that defendant does not contend that his statement was involuntary under the traditional standards to which the high court referred in *Oregon* v. *Hass, supra*, 420 U.S. 714. (See *People* v. *Bradford, supra*, 14 Cal.4th 1005, 1039-1040, 1042 [police officer's deliberate misconduct in failing to honor suspect's invocation of the right to counsel does not, by itself, render ensuing statement involuntary].) In the Court of Appeal, defendant did assert that his statement not merely was taken in violation of *Miranda* and *Edwards*, but actually was coerced, and therefore involuntary, because the police ignored his invocation of the right to remain silent and to counsel, but he does not renew this claim in this court.

deter future violations of rules not compelled directly by the Constitution in the first place." (*Id.* at pp. 351-352 [110 S.Ct. at pp. 1181-1181].)

Further, as the People contend, it would be anomalous to hold that the applicability of the *Harris* rule depends upon the subjective intent of the interrogating police officer, when other applications of the *Miranda* rule generally do not turn upon the individual officer's subjective state of mind, but rather upon the accused's perception of his or her circumstances. (See, e.g., *Stansbury* v. *California* (1994) 511 U.S. 318, 319 [114 S.Ct. 1526, 1527, 128 L.Ed.2d 293] [whether person is in custody for purposes of *Miranda* turns upon accused's perception; view of officer that suspicion has focused upon individual is not relevant unless conveyed to the accused]; *Rhode Island* v. *Innis, supra,* 446 U.S. at p. 301 [100 S.Ct. at p. 1690] [question whether interrogation has occurred under the *Miranda* rule turns "primarily upon the perceptions of the suspect, rather than the intent of the police"]; cf. *Davis* v. *United States, supra,* 512 U.S. at pp. 458-459 [114 S.Ct. at p. 2355] [recognizing that the question whether a suspect has *invoked* the right to counsel involves *police officer's* perceptions, but establishing an objective standard to test those perceptions: The officer need not stop questioning a suspect if "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel"]; and *Rhode Island* v. *Innis, supra,* 446 U.S. at p. 301, fn. 7 [100 S.Ct. at p. 1690] ["This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response."].)

More specifically, once a suspect has been warned of his or her rights pursuant to *Miranda*, the question to be asked regarding any subsequent statement is whether it was made under circumstances establishing a voluntary, knowing waiver of those rights—a question calling for an examination of the state of mind of the person undergoing interrogation, rather than the state of mind of the interrogator. (*Moran* v. *Burbine* (1986) 475 U.S. 412, 421-422 [106 S.Ct. 1135, 1140-1141, 89 L.Ed.2d 410] [deliberate misconduct of the police, if unknown to the suspect, is irrelevant to the waiver inquiry—police failure to inform suspect of attorney's telephone call regarding his representation has no bearing upon the validity of the suspect's waiver of the right to counsel].)

██ *Edwards* directs that we presume that a suspect who has asserted the right to counsel—but whose interrogation continues—has not waived the right to counsel when he or she makes a statement (*Edwards, supra,* 451 U.S. at p. 484 [101 S.Ct. at pp. 1884-1885]), because invocation of the right to

counsel indicates that " 'the accused [has] expressed his own view that he is not competent to deal with the authorities without legal advice . . . .' " (*Arizona* v. *Roberson* (1988) 486 U.S. 675, 681 [108 S.Ct. 2093, 2098, 100 L.Ed.2d 704].) This presumption may be dispelled if the suspect reinitiates contact, so long as there are facts relevant to the *suspect's* state of mind showing a valid waiver. (*Edwards, supra,* 451 U.S. at pp. 482, 485, 486, fn. 9 [101 S.Ct. at pp. 1883-1884, 1885-1886]; see also *Smith* v. *Illinois* (1984) 469 U.S. 91, 95 [105 S.Ct. 490, 492-493, 83 L.Ed.2d 488]; *Oregon* v. *Bradshaw* (1983) 462 U.S. 1039, 1044-1045 [103 S.Ct. 2830, 2834-2835, 77 L.Ed.2d 405]; *People* v. *Bradford, supra,* 14 Cal.4th at p. 1036.) Proof of a waiver of the right to counsel depends not upon the police officer's intent in continuing the interrogation, but upon whether the accused possessed "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran* v. *Burbine, supra,* 475 U.S. at p. 421 [106 S.Ct. at p. 1141]; see also *North Carolina* v. *Butler* (1979) 441 U.S. 369, 373 [99 S.Ct. 1755, 1757, 60 L.Ed.2d 286].)

Once the suspect invokes the right to counsel, the officer's subjective state of mind remains irrelevant to the question whether the suspect subsequently waived the right to counsel. As the court determined in *Arizona* v. *Roberson, supra,* 486 U.S. 675, the interrogating officer's lack of knowledge that the suspect previously invoked his right to counsel is irrelevant to the question whether the suspect knowingly and voluntarily waived the right to counsel, because the relevant inquiry is the *suspect's* state of mind. (*Id.* at p. 687 [108 S.Ct. at p. 2101].) If the officer's good faith in commencing the interrogation is irrelevant because the focus is on the suspect's state of mind, it appears that the officer's bad faith would be equally irrelevant.

From these high court decisions, we understand that the waiver inquiry turns upon the suspect's state of mind rather than that of the interrogating officer. In the present case, similarly, to the extent we wish to serve *Edwards*'s goal of protecting the suspect from the coercive pressure to waive the privilege against self-incrimination that is inherent in custodial interrogation and to recognize only waivers of constitutional rights that are knowing and voluntary, the suspect's perception of the coerciveness of his or her circumstances is not altered when the officer possesses an *unspoken* intent to violate *Edwards* for the purpose of securing impeachment evidence. The question whether the suspect knowingly and intelligently has waived the right to counsel of which he or she has been informed is not answered by examining the silent purposes of the interrogating officer. Rather, evidence of deliberation on the part of the police and—as apparent in this case—of a purpose to violate the suspect's rights in order to secure evidence, implicates the balance struck by the high court in *Harris* and subsequent cases between

deterrence of police misconduct and exposure of perjury. Such evidence may call into question the accuracy of the high court's conclusion in *Harris* that police misconduct will be deterred adequately by excluding improperly obtained evidence from the prosecution's case-in-chief, but such evidence does not render the *Harris* rule inapplicable.

In a Court of Appeal decision that analyzes the precise issue before us, the court held that a deliberate *Edwards* violation is subject to the *Harris* rule. (*People* v. *Baker* (1990) 220 Cal.App.3d 574, 576, 579 [269 Cal.Rptr. 475], cert. den. 498 U.S. 947 [111 S.Ct. 362, 112 L.Ed.2d 325].) The court explained convincingly that the defendant's objection to the use for impeachment purposes of a statement taken in deliberate violation of *Edwards* was based upon a perceived need to deter police misconduct, but that this argument expressly was rejected in *Harris* in favor of preventing or exposing defendants' perjury at trial. (220 Cal.App.3d at p. 579; cf. *People* v. *Bey* (1993) 21 Cal.App.4th 1623, 1628 [27 Cal.Rptr.2d 28] [deliberate *Edwards* violation *in conjunction* with misrepresentation to accused that his statement will not be used against him renders the statement *involuntary* and inadmissible for all purposes]; see also *Bradford* v. *Whitley* (5th Cir. 1992) 953 F.2d 1008, 1009-1010 [repeated and apparently deliberate *Edwards* violations subject to *Harris* rule]; *Houston* v. *Lockhart* (8th Cir. 1989) 866 F.2d 264, 267 [same]; *United States* ex rel. *Adkins* v. *Greer* (7th Cir. 1986) 791 F.2d 590 [same].)

Our research has disclosed no criminal case holding that the *Harris* rule is inapplicable when an officer deliberately violates *Edwards*—absent other misrepresentations or coercive behavior on the part of the police that renders the defendant's statements involuntary. One decision of a federal district court determining whether the civil plaintiffs stated a claim under 42 United States Code section 1983 suggests that the applicability of the *Harris* rule may depend upon whether the police acted purposefully or ignorantly in violating *Miranda* and *Edwards* rights. (*California Attorneys for Criminal Justice* v. *Butts* (C.D.Cal. 1996) 922 F.Supp. 327, 335-336 (*Butts*).) Determining that the plaintiffs stated a cause of action in connection with an interrogation that occurred pursuant to a deliberate, premeditated policy of ignoring suspects' assertions of the right to remain silent and to an attorney, the district court suggested that the *Harris* rule was intended only to avoid punishing good faith mistakes on the part of the police, but was not intended to "provide the police with the option of either ceasing questioning or continuing onward in the hopes of acquiring impeachment evidence." (*Id.* at p. 336.)

We agree that the *Harris* opinion was not intended to *encourage* police misconduct but, as we have explained above, we do not agree that the *Harris*

rule was intended to apply *only* in cases of good faith mistake on the part of interrogating officers. Further, the issue before the federal district court in *Butts, supra*, 922 F.Supp. 327, was not one of admissibility of evidence in a criminal prosecution. Rather, that court was faced with determining whether the plaintiffs had stated a claim under 42 United States Code section 1983 by alleging intentional, deliberate *Miranda* violations in conjunction with deception of the accused during interrogation. In the state criminal case underlying the federal district court case, we note that the court found the suspect's statements inadmissible because they were *involuntary*, and not on the ground that deliberate police misconduct made the *Harris* rule inapplicable. (*People* v. *Bey, supra*, 21 Cal.App.4th at p. 1628.) Although deliberate police misconduct of this nature may cross the line into coercion (see, e.g., *People* v. *Montano* (1991) 226 Cal.App.3d 914, 935-936 [277 Cal.Rptr. 327]; *Cooper* v. *Dupnik* (9th Cir. 1992) 963 F.2d 1220, 1223-1231, 1237; see also *Collazo* v. *Estelle* (9th Cir. 1991) 940 F.2d 411, 416-418, 426), no analytical reason appears to permit deviation from the *Harris* rule on account of deliberate police misconduct when no actual coercion occurs.

Accordingly, because of language in *Harris* and subsequent cases requiring that a balance be struck between deterring police misconduct and exposing defendants who commit perjury at trial, and because the analysis applicable to claims that a statement has been obtained in violation of *Miranda* directs the court's attention to the suspect's state of mind rather than to the silent purposes of the interrogating officer, we reject defendant's claim that *Harris* is inapplicable when the interrogating officer deliberately fails to honor a suspect's request for counsel with the objective of securing evidence for impeachment purposes.

## B

■ In concluding that a statement taken in deliberate violation of *Edwards* may be admitted for impeachment purposes, we are not indicating agreement with the argument of amici curiae in support of the People, and relied upon to some extent by the People at oral argument, that *Miranda* and *Edwards* impose no affirmative duties upon police officers, but merely establish rules of evidence. As our discussion of these cases must make evident, the high court has imposed an affirmative duty upon interrogating officers to cease questioning once a suspect invokes the right to counsel, and this rule regarding police conduct serves to protect the accused in determining whether to waive his or her constitutional rights. Nothing in the language of *Harris* or *Oregon* v. *Hass, supra*, 420 U.S. 714, for example, suggests that the court now considers the *Miranda* or *Edwards* rules as constituting mere advice regarding preferred police conduct. Rather, the court in *Harris* referred to the *illegality* of the police conduct in that case. It relied upon the

principle underlying the Fourth Amendment exclusionary rule, which, by excluding " 'evidence *unlawfully* obtained' " from the case-in-chief but not for impeachment purposes, attempts to deter *"impermissible police conduct"* without permitting the defendant to " 'turn the *illegal method by which evidence . . . was obtained* to his own advantage.' " (*Harris, supra,* 401 U.S. at pp. 224-225 [91 S.Ct. at p. 645], italics added.) Similarly, the decision in *Oregon* v. *Hass* recognizes the need to deter " *'proscribed police conduct.'* " (*Oregon* v. *Hass, supra,* 420 U.S. at p. 721 [95 S.Ct. at p. 1220], quoting *Harris, supra,* 401 U.S. at p. 225 [91 S.Ct. at p. 645], italics added.)

Indeed, on several occasions, the high court has reiterated the mandatory nature of the duty imposed by the *Miranda* and *Edwards* decisions upon the police, and although it has characterized the rules promulgated by these decisions as prophylactic, it never has retreated from the requirement that police officers regulate their conduct according to the dictates of these cases. In *Moran* v. *Burbine, supra,* 475 U.S. 412, for example, the high court declared: "To combat this inherent compulsion [of custodial interrogation], and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda imposed on the police an obligation to follow certain procedures in their dealings with the accused.* In particular, prior to the initiation of questioning, they must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.' [Citation.] Beyond this duty to inform, *Miranda* requires that the police respect the accused's decision to exercise the rights outlined in the warnings. 'If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, [or if he] states that he wants an attorney, the interrogation must cease.' " (*Id.* at p. 420 [106 S.Ct. at p. 1140], italics added.) Similarly, in *Arizona* v. *Roberson, supra,* 486 U.S. 675, the court stated that " 'it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel' " (*id.* at p. 680 [108 S.Ct. at p. 2097]), and the court further observed that "the *'relatively rigid requirement that interrogation must cease upon the accused's request for an attorney . . . has the virtue of informing police and prosecutors with specificity as to what they may do in conducting custodial interrogation . . . .'* The *Edwards* rule thus serves the purpose of providing *'clear and unequivocal' guidelines to the law enforcement profession.* Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with the police only through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.' " (*Id.* at pp. 681-682 [108 S.Ct. at p. 2098], quoting *Fare* v.

*Michael C.* (1979) 442 U.S. 707, 718 [99 S.Ct. 2560, 2568, 61 L.Ed.2d 197], italics added, fn. omitted; see also *Davis* v. *United States, supra,* 512 U.S. 452, 454 [114 S.Ct. 2350, 2352] ["In *Edwards* . . . we held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation."]; *Minnick* v. *Mississippi* (1990) 498 U.S. 146, 151 [111 S.Ct. 486, 490, 112 L.Ed.2d 489] ["The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application. We have confirmed that the *Edwards* rule provides ' "clear and unequivocal" guidelines to the law enforcement profession.' "]; *People* v. *Bradford, supra,* 14 Cal.4th 1005, 1042 [police officers' "conduct in deliberately interrogating defendant after defendant had invoked his right to counsel was unethical and it is strongly disapproved"]; *In re Gilbert E.* (1995) 32 Cal.App.4th 1598, 1602 [38 Cal.Rptr.2d 866] [deploring deliberate *Miranda* violation and observing that "[w]hen the police deliberately step over the line and disobey Supreme Court pronouncements, respect for the rule of law necessarily diminishes"]; *People* v. *Bey, supra,* 21 Cal.App.4th 1623, 1627 [expressing grave concern at deliberate *Edwards* violation, and observing that such police misconduct appears not to be a new tactic]; *People* v. *Baker, supra,* 220 Cal.App.3d 574, 579 [also deploring intentional *Miranda* violation and noting "the trial court here was well aware of the unlawfulness of the police conduct and stated that it intended to initiate steps to prohibit the San Diego Police Department from using such procedures in the future"].)

The claim that the *Miranda* and *Edwards* rules simply are rules of evidence and do not regulate police conduct is inconsistent with the rationale underlying the exclusionary rule of those cases. The reason a statement taken in violation of a suspect's *Miranda* and *Edwards* rights is inadmissible in the prosecution's case-in-chief is not that the statement is considered potentially confusing or unreliable and thus subject to exclusion under evidentiary rules such as those regulating relevancy or hearsay. Rather, such evidence is excluded because the evidence was obtained *illegally.* As the high court has declared: "The prosecution must not be allowed to build its case against a criminal defendant with evidence acquired in contravention of constitutional guarantees and their corresponding judicially created protections." (*Michigan* v. *Harvey, supra,* 494 U.S. at p. 351 [110 S.Ct. at p. 1180].)

The rule that a statement taken in violation of *Edwards* may be admissible for impeachment purposes is founded not upon any recognition that the police legitimately may interrogate a suspect despite the suspect's demand for counsel. Rather, as our opinion has stressed, it is founded upon the balance struck in *Harris* between the two values that the high court has recognized but identified as competing—deterring police misconduct and

exposing defendants who perjure themselves at trial. That the court struck a balance favoring the latter value does not detract from the court's recognition that it is indeed police misconduct to interrogate a suspect in custody who has invoked the right to counsel. Assuming, as it did, that no widespread police misconduct would follow from its decision, the court in *Harris* simply concluded that exclusion of the evidence for all purposes, to the extent such a rule would supply additional deterrence of police misconduct, was not worth the loss that would result at trial if impeachment evidence were inadmissible to expose perjury committed by defendants.

C

■ Defendant contends he has shown that it is no longer a matter of conjecture or speculation that the *Harris* rule has encouraged police departments, as a matter of policy, to cease giving the advice required by the *Miranda* decision, and that the *Harris* rule has caused police officers routinely to ignore suspects' invocation of the right to remain silent or to counsel. He urges us to consider evidence of allegedly widespread police departmental policy and training supporting such a practice, and further to consider whether the *Harris* rule should apply to statements taken pursuant to such a widespread policy.

We need not determine whether widespread, systematic police misconduct was contemplated by the *Harris* decision and whether statements taken pursuant to such a systematic policy of police misconduct would be admissible for the purpose of impeachment. Nor, indeed, need we decide whether this court has authority to declare an exception to the *Harris* rule in cases of widespread police abuse (see *People v. May, supra,* 44 Cal.3d 309), because there is a substantial barrier to appellate review of defendant's claim. Defendant did not make this argument in the trial court. Accordingly, we conclude that the argument has not been preserved for appeal. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 54 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People v. Mattson* (1990) 50 Cal.3d 826, 853-854 [268 Cal.Rptr. 802, 789 P.2d 983].) Further, it is our policy not to review issues that are dependent upon development of a factual record when those issues have not been timely raised in the Court of Appeal or not reached in that court, when the latter omission was not brought to the attention of the Court of Appeal by petition for rehearing. (Cal. Rules of Court, rule 29(b).) As will be apparent from our discussion below, defendant did not make a timely attempt in the Court of Appeal to raise his claim regarding the effect of widespread police misconduct on the *Harris* rule.

Defendant contends that his efforts to establish this claim—that he was interrogated as the result of a widespread practice on the part of police

departments to ignore a suspect's invocation of the right to counsel—were thwarted at the trial level and on appeal, so that his failure to raise the question below should be excused. We do not agree with defendant that the trial court prevented him from developing such a record at the trial level, or that the Court of Appeal erred in refusing to permit him to develop such a record at the appellate level.

The single question as to which the trial court sustained an objection at the *in limine* hearing on the admissibility of defendant's statements was whether the officer understood that he had violated the law when he ignored defendant's invocation of the right to counsel.[3] This question was not directed at any practice on the part of the local police department, nor did defendant attempt to make an offer of proof on the subject of widespread police misconduct, or even to argue the ground upon which he now urges the exclusion of his statement.

Nor was defendant's contention—that evidence of widespread police misconduct warrants a deviation from or reconsideration of the *Harris* rule—raised in defendant's opening brief on appeal. It was not until his reply brief that the contention began to emerge. Normally, a contention may not be raised for the first time in a reply brief. (*People* v. *King* (1991) 1 Cal.App.4th 288, 297, fn. 12 [2 Cal.Rptr.2d 197].)

Even in his reply brief, defendant conceded that "[t]he incidence or frequency of intentional police violation of *Miranda* in San Bernardino County has not been empirically verified." Nonetheless, he requested that the Court of Appeal take judicial notice of litigation then pending in the federal district court in *Butts, supra,* 922 F.Supp. 337, in which the defendant in *People* v. *Bey, supra,* 21 Cal.App.4th 1623, sued the officers responsible for his interrogation, seeking damages under 42 United States Code section 1983. Defendant represented that the federal lawsuit alleged that officers in the Los Angeles and Santa Monica Police Departments routinely continue to question suspects after they have asked to speak with a lawyer. Defendant also requested that the appellate court take judicial notice of two newspaper articles, the contents of which do not appear in the record. In response, the Court of Appeal stated: "Defendant asks us to take judicial notice of the federal court litigation, apparently to show the problem of intentional *Miranda* violations is widespread. We take notice of the action's pendency, but decline to draw any further inference. The allegations of misconduct in

---

[3]At trial, unlike at the *in limine* hearing, when defense counsel asked the officer whether he knew he was violating *Miranda* when he continued to question defendant after invocation of the right to counsel, the court sustained the People's objection. Counsel did not seek to question the officer regarding any practice on the part of the local police department.

[that case] concern practices of the Los Angeles and Santa Monica police departments. Those allegations are not relevant in the present case, involving a wholly unrelated law enforcement agency." We conclude that the Court of Appeal properly declined to draw any inference in support of defendant's belated claim, because the case upon which defendant relied did not involve the practice of the police department whose officers interrogated him.

After the matter was submitted for decision in the Court of Appeal, the defendant made another effort to supply additional evidence of widespread police misconduct, in the form of a motion to vacate submission, and to present additional evidence—or, in the alternative, for judicial notice or to treat the appeal as a petition for writ of habeas corpus. He submitted 18 exhibits, including police training materials—some predating and some postdating defendant's arrest—that advocated the practice of questioning suspects after they have invoked the right to counsel, and also including excerpts from trial transcripts in cases from several jurisdictions involving alleged intentional *Edwards* violations. One of these fragments of a trial transcript related to a trial in San Bernardino County, but it contains no evidence that that county's officers have been trained to violate *Edwards* or that the interrogation involved in the present case was part of a widespread pattern of misconduct. The Court of Appeal denied the motion without comment and did not address defendant's claim, made only tangentially in the reply brief, that evidence of a widespread police policy of refusing to honor a suspect's invocation of the right to counsel would warrant an exception to the *Harris* rule, or a reexamination of that rule. Defendant did not petition for rehearing in the Court of Appeal.

Defendant's efforts, after submission of the matter for decision in the Court of Appeal, to supply additional evidence that there exists a widespread practice in Southern California to ignore a suspect's invocation of the right to counsel, are in contravention of the general rule that an appellate court generally is not the forum in which to develop an additional factual record, particularly in criminal cases when a jury trial has not been waived. (See Cal. Const., art. VI, § 11; Code Civ. Proc., § 909; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 789-790, pp. 822-824; see also *People* v. *Benford* (1959) 53 Cal.2d 1, 7 [345 P.2d 928].) In any event, the motion was made late in the proceedings and was unaccompanied by any demonstration that the evidence (at least that predating defendant's arrest)—even if properly subject to judicial notice—could not have been made available at trial, or that the evidence either predating or postdating defendant's arrest showed widespread police misconduct *in the police department whose officers interrogated defendant.* The Court of Appeal properly exercised its discretion to deny the motion. (See *Brosterhous* v. *State Bar* (1995) 12 Cal.4th 315, 325,

326 [48 Cal.Rptr.2d 87, 906 P.2d 1242] [declining to take judicial notice of a record that should have been but was not presented in the first instance to the trial court]; see also *People* v. *Benford, supra,* 53 Cal.2d at p. 7 [even if new evidence sometimes may be considered on appeal in criminal cases, appellate courts appropriately decline to consider it when the defendant fails to establish that the evidence was unavailable at trial]; *People* v. *King, supra,* 1 Cal.App.4th at p. 297, fn. 12 [claims generally may not be raised for the first time in a reply brief]; 9 Witkin, Cal. Procedure, *supra,* Appeal, § 801, pp. 832-833.)[4]

Because defendant did not raise in the trial court his claim that his interrogation is an example of widespread violation of the *Edwards* rule and that such widespread abuse warrants deviation from the *Harris* rule, and because no reason appears to justify considering new evidence in support of the claim for the first time on appeal, we need not determine whether we should—or could—consider any exception to the *Harris* rule in the present case.

## III

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I concur in the result.

I agree with the majority that we should affirm the judgment of the Court of Appeal, which affirmed the judgment of the superior court, because I do not believe that there was any reversible error at trial.

---

[4]We deny the request of amicus curiae California Attorneys for Criminal Justice that we take judicial notice of a number of exhibits that assertedly demonstrate that police officers in some departments in California are trained to interrogate suspects after they have invoked the right to counsel. Many are the same exhibits offered by defendant as supplemental evidence in the Court of Appeal. We also deny the request of amicus curiae the National Association of Criminal Defense Lawyers that we take judicial notice of the transcript of a training video that also is referred to in the request for judicial notice submitted by the California Attorneys for Criminal Justice. Even assuming the exhibits properly are noticeable, the requests for judicial notice are denied because the issue upon which the exhibits are offered was not raised in the trial court, and no effort was made in that court to supply similar evidence. The same rationale that supported the Court of Appeal, in its denial of defendant's request to supply additional evidence, supports our decision to deny the request of amici curiae. We observe, too, that some evidence of departmental policy in Los Angeles and Santa Monica is proffered, but none relating to San Bernardino. The proffered evidence is of limited relevance to the interrogation in the present case, because it does not relate directly to the jurisdiction whose officers interrogated defendant, and because much of it postdates his interrogation.

I so conclude inasmuch as I am of the view that defendant failed to raise the question in the superior court whether a statement would be admissible against a criminal defendant, even solely to impeach his credibility as a witness, if it had been obtained by an officer of a law enforcement agency pursuant to a policy to violate *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974] (hereafter sometimes *Miranda*). Had he raised the question, I believe that we would have to answer it in the negative.

The Fifth Amendment to the United States Constitution establishes a privilege against self-incrimination: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." In and of itself, the provision applies against the United States. (*Barron* v. *Baltimore* (1833) 32 U.S. (7 Pet.) 243, 247-250 [8 L.Ed. 672, 674-675].) Through the Fourteenth Amendment's due process clause, it applies as well against the several states. (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 8 [84 S.Ct. 1489, 1493-1494, 12 L.Ed.2d 653].) Among its underlying policies are the prevention of over-reaching by the government and the consequent mistreatment of the individual, whether by physical torture or psychological pressure, by blatant measures or subtle devices (see, e.g., *Ullmann* v. *United States* (1956) 350 U.S. 422, 428 [76 S.Ct. 497, 501, 100 L.Ed. 511, 53 A.L.R.2d 1008]); the exclusion of evidence that is regarded as inherently unreliable (see, e.g., *Murphy* v. *Waterfront Comm'n* (1964) 378 U.S. 52, 55 [84 S.Ct. 1594, 1596-1597, 12 L.Ed.2d 678]); and, perhaps most fundamentally, the striking and maintaining of a fair balance between the government and the individual as the former proceeds against the latter with threat of criminal sanction (see, e.g., *Malloy* v. *Hogan, supra,* 378 U.S. at pp. 7-8 [84 S.Ct. at pp. 1493-1494]; *Murphy* v. *Waterfront Comm'n, supra,* 378 U.S. at p. 55 [84 S.Ct. at pp. 1596-1597]). By its very letter, it prohibits judges from compelling testimony from a witness in the courtroom. (U.S. Const., Amend. V.) In accordance with its spirit, it also forbids officers of law enforcement agencies from coercing statements, within their precincts, from a person suspected of crime. (E.g., *Miranda* v. *Arizona, supra,* 384 U.S. at pp. 458-466 [86 S.Ct. at pp. 1619-1624]; *Bram* v. *United States* (1897) 168 U.S. 532, 542 [18 S.Ct. 183, 186-187, 42 L.Ed. 568].)

In *Miranda,* the United States Supreme Court expressly declared what it had impliedly recognized in other decisions stretching back scores of years—namely, that custodial interrogation of a criminal suspect by an officer of a law enforcement agency is at least potentially coercive. (See *Miranda* v. *Arizona, supra,* 384 U.S. at pp. 457-458 [86 S.Ct. at pp. 1618-1619].)

Prior to *Miranda,* the court had attempted to cure the evil of coercion of criminal suspects during custodial interrogation by officers of law enforcement agencies, and to do so on a case-by-case basis through a post hoc

application of a fact-specific "totality of the circumstances" test of "voluntariness." (See generally, 1 LaFave & Israel, Criminal Procedure (1984) §§ 6.1-6.2, pp. 434-451.) For federal prosecutions, it relied on either the Fifth Amendment privilege against self-incrimination or a preconstitutional common law rule. (See, e.g., *United States* v. *Carignan* (1951) 342 U.S. 36, 41 [72 S.Ct. 97, 100, 96 L.Ed. 48].) For state prosecutions, by contrast, it relied on the Fourteenth Amendment's due process clause (see, e.g., *Brown* v. *Mississippi* (1936) 297 U.S. 278, 285-286 [56 S.Ct. 461, 464-465, 80 L.Ed. 682]), inasmuch it had not yet held the Fifth Amendment applicable against the several states, and had already construed the Fourteenth Amendment's due process clause to embrace an expanded version of the preconstitutional common law rule. By taking this approach, however, it failed to provide agencies and their officers with standards for conduct; it also failed to furnish trial courts with principles for the admissibility of a suspect's statement. (1 LaFave & Israel, Criminal Procedure, *supra*, § 6.2(d), p. 450.)

Apparently dissatisfied with the results, the court in *Miranda* undertook to prevent the evil of coercion of criminal suspects during custodial interrogation by officers of law enforcement agencies, and to do so systematically through the granting of rights to suspects and the imposition of obligations on agencies and their officers, and also through the declaration of a rule of evidence for trial courts (see 1 LaFave & Israel, Criminal Procedure, *supra*, § 6.2(d), pp. 449-451)—as follows:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 444-445 [86 S.Ct. at p. 1612].)

By taking this approach, the court in *Miranda* intended to provide standards for law enforcement agencies and their officers and also to furnish principles for trial courts, and did in fact do so. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 441-442 [86 S.Ct. at pp. 1610-1611].)

In order to govern proceedings in the courtroom, the court in *Miranda* declared the rule of evidence quoted above. It fashioned it as one of exclusion. It made admissibility depend on certain "prerequisites." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 476 [86 S.Ct. at p. 1629].)

In order to control conduct outside the courtroom, the court in *Miranda* granted the quoted rights to criminal suspects and imposed the quoted obligations on law enforcement agencies and their officers. It established these rights and obligations as the "prerequisites" to admissibility under its rule of evidence. (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 476 [86 S.Ct. at p. 1629].) Although "prerequisites," they were not mere preconditions: They possessed independent force and effect, constituting a "fundamental with respect to the Fifth Amendment privilege and not simply [an evidentiary] preliminary . . . ." (*Ibid.*) It made plain that these *specific* rights and obligations were not themselves compelled by the Fifth Amendment (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 467, 490-491 [86 S.Ct. at pp. 1624, 1636-1637])—that these rights and obligations, to use the term that would become common, were "prophylactic" entitlements and constraints rather than substantive constitutional ones (e.g., *Withrow* v. *Williams* (1993) 507 U.S. 680, 690-692 [113 S.Ct. 1745, 1752-1753, 123 L.Ed.2d 407]). But it also made plain that *some such* rights and obligations were practically demanded. (*Miranda* v. *Arizona, supra,* 384 U.S. at pp. 458, 467 [86 S.Ct. at p. 1619, 1624].) For, in their absence, "no statement obtained from" a suspect "can truly be the product of his free choice." (*Id.* at p. 458 [86 S.Ct. at p. 1619].) In words that it later spoke: " 'Prophylactic' though" they "may be, in protecting a" suspect's "Fifth Amendment privilege against self-incrimination," they "safeguard[] 'a fundamental . . . right.' " (*Withrow* v. *Williams, supra,* 507 U.S. at p. 691 [113 S.Ct. at p. 1753].)[1]

As the years have passed, the court has confirmed the rights that it granted in *Miranda* to criminal suspects and the obligations that it there imposed on law enforcement agencies and their officers. (See, e.g., *Withrow* v. *Williams, supra,* 507 U.S. at pp. 686-695 [113 S.Ct. at pp. 1750-1755].) Particularly, it has confirmed these rights and obligations to have force and effect independent of the rule of evidence for which they are "prerequisites." (See, e.g.,

---

[1] See LaFave, *Constitutional Rules for Police: A Matter of Style* (1990) 41 Syracuse L.Rev. 849, 859 (commenting that "the fifth amendment at the stationhouse [would] be meaningless without the protections of *Miranda*").

*Moran* v. *Burbine* (1986) 475 U.S. 412, 420 [106 S.Ct. 1135, 1140, 89 L.Ed.2d 410].) It has not made the suspect's rights variable. (Compare *Berkemer* v. *McCarty* (1984) 468 U.S. 420, 429 [104 S.Ct. 3138, 3144-3145, 82 L.Ed.2d 317] [declining to narrow *Miranda*], with *Moran* v. *Burbine, supra*, 475 U.S. at p. 427 [106 S.Ct. at p. 1144] [declining to broaden *Miranda*].) Although a suspect may effect a waiver of his entitlements, he may not suffer a deprivation thereof. Neither has it made the obligations of the agency and officer optional. (See *Cooper* v. *Dupnik* (9th Cir. 1992) 963 F.2d 1220, 1243 (in bank).) They are not free to conduct, or misconduct, themselves like Holmes's "bad man, who cares only for the material consequences" of obeying or disobeying the law. (Holmes, *The Path of the Law* (1897) 10 Harv.L.Rev. 457, 459.) That is to say, they are not at liberty to take up or put down their constraints as they may choose, depending on whether, with an eye toward the related rule of evidence, they are eager to preserve, or are willing to sacrifice, the prosecution's ability to use at trial any statement that they may happen to obtain. To allow such a license would eviscerate *Miranda*, which was intended to prevent coercion, not to tolerate its risk. It would also hit at the Fifth Amendment itself, which is concerned, in part, with government overreaching and mistreatment of the individual.

To be sure, the court has somewhat qualified the rule of evidence that it declared in *Miranda*.

For example, in *Harris* v. *New York* (1971) 401 U.S. 222 [91 S.Ct. 643, 28 L.Ed.2d 1] (hereafter sometimes *Harris*), in which a law enforcement officer, prior to *Miranda*, failed to anticipate his obligation to advise a criminal suspect of his right to the presence of an appointed attorney, the court created an exception to *Miranda*'s rule of evidence, holding that the prosecution may use a *Miranda*-violative statement solely to impeach a criminal defendant's credibility as a witness, but not to make its case-in-chief. (*Harris* v. *New York, supra*, 401 U.S. at pp. 224, 226 [91 S.Ct. at pp. 645, 646].) It explained: "The impeachment process . . . provide[s] valuable aid . . . in assessing [the defendant's] credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief." (*Id.* at p. 225 [91 S.Ct. at p. 645].)

Similarly, in *Oregon* v. *Hass* (1975) 420 U.S. 714 [95 S.Ct. 1215, 43 L.Ed.2d 570] (hereafter sometimes *Hass*), in which a law enforcement officer fulfilled his obligation under *Miranda* to advise a criminal suspect defendant of his rights, but apparently breached his obligation to cease

questioning when the suspect expressed a wish to consult with an attorney, the court adhered to the impeachment exception created in *Harris*. It stated that it saw "no valid distinction to be made in the application of the principles of *Harris* to that case and to Hass' case." (*Id.* at p. 722 [95 S.Ct. at p. 1221].) "The only possible factual distinction . . . lies in the fact that the *Miranda* warnings given Hass were proper, whereas those given Harris were defective. The deterrence of the exclusionary rule, of course, lies in the necessity to give the warnings. That these warnings, in a given case, may prove to be incomplete, and therefore defective, as in *Harris*, does not mean that they have not served as a deterrent to the officer who is not then aware of their defect; and to the officer who is aware of the defect the full deterrence remains. The effect of inadmissibility in the *Harris* case and in this case is the same: inadmissibility would pervert the constitutional right into a right to testify falsely free from the embarrassment of impeachment evidence from the defendant's own mouth. [¶] One might concede that when proper *Miranda* warnings have been given, and the officer then continues his interrogation after the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material. This speculative possibility, however, is even greater where the warnings are defective and the defect is not known to the officer. In any event, the balance was struck in *Harris*, and we are not disposed to change it now." (*Id.* at p. 723 [95 S.Ct. at p. 1221].)

It is plain, however, that the court has not qualified the rule of evidence that it declared in *Miranda*, as it were, unqualifiedly.

Specifically, the court has not qualified *Miranda*'s rule of evidence in the face of a policy of a law enforcement agency, in exploitation of the impeachment exception of *Harris* and *Hass*, to obtain statements from criminal suspects in violation of *Miranda*—"outside *Miranda*," to use the current law enforcement euphemism—for example, in the face of an agency's policy requiring its officers to continue to attempt to get information by breaching their obligations after they have gotten all the information that they could get by fulfilling them initially. Rather, the court has acted only in the context of a default by an individual officer.

The absence of a qualification of *Miranda*'s rule of evidence here should cause no surprise.

Any policy of a law enforcement agency to obtain statements from criminal suspects in violation of *Miranda* would strike through the suspect's "prophylactic" rights toward his substantive Fifth Amendment privilege against self-incrimination itself. When, for example, the suspect invokes his

"prophylactic" right to remain silent, he thereby invokes his substantive Fifth Amendment privilege. (See *Miranda* v. *Arizona, supra,* 384 U.S. at p. 474 [86 S.Ct. at pp. 1627-1628].) Hence, an officer's further questioning in spite of the invocation would threaten to dishonor the latter as well as the former. (See *ibid.*) Similarly, when the suspect invokes his "prophylactic" right to the presence of an attorney, he thereby invokes his substantive Fifth Amendment privilege. (See *Fare* v. *Michael C.* (1979) 442 U.S. 707, 719 [99 S.Ct. 2560, 2568-2569, 61 L.Ed.2d 197].) Again, an officer's further questioning in spite of the invocation would threaten to dishonor the latter as well as the former. (See *Miranda* v. *Arizona, supra,* 384 U.S. at p. 474 [86 S.Ct. at pp. 1627-1628].)

Moreover, any policy of a law enforcement agency to obtain statements from criminal suspects in violation of *Miranda* would necessarily constitute proof that "sufficient deterrence" of "proscribed . . . conduct" does not, in fact, "flow[]" from exclusion of such statements from the prosecution's case-in-chief. (*Harris* v. *New York, supra,* 401 U.S. at p. 225 [91 S.Ct. at p. 645].) At the same time, it would necessarily constitute proof that a more than sufficient incentive to such conduct is given by their admissibility under the impeachment exception of *Harris* and *Hass.* For, in a situation of this sort, "proscribed . . . conduct" would not figure merely as a "speculative possibility." (*Harris* v. *New York, supra,* 401 U.S. at p. 225 [91 S.Ct. at p. 645].) It would rather present itself as an actual fact. Any argument based on the Sixth Amendment decision of *Michigan* v. *Harvey* (1990) 494 U.S. 344, 351 [110 S.Ct. 1176, 1181, 108 L.Ed.2d 293], to the effect that "the 'search for truth in a criminal case' outweighs the 'speculative possibility' that exclusion of" such statements, even for purposes of impeachment, "might deter future violations," would prove not to be persuasive. The balance struck in favor of the "search for truth" over the "speculative possibility" of deterrence has been struck only in the context of a default by an individual officer. Here it is different. In one pan of the scale, of course, one must place the "search for truth." But, in the other, one must place much more than a mere "speculative possibility" of deterrence. By definition, a policy of the kind described above would be designed to exploit the impeachment exception of *Harris* and *Hass.* Without the availability of such an exception, it would have no reason for existence and therefore, unless unreasonable, would not exist. It may indeed be true, as stated in *Michigan* v. *Tucker* (1974) 417 U.S. 433, 447 [94 S.Ct. 2357, 2365, 41 L.Ed.2d 182], that, "[w]here . . . official action [is] pursued in complete good faith, . . . the deterrence rationale loses much of its force." But if so, it must also be true that, where official action is pursued in utter bad faith, as in accordance with the type of policy in question, the deterrence rationale retains its force without any diminution whatsoever.

All this is not to deny that the impeachment exception of *Harris* and *Hass* could be extended, *vi et armis*, to circumstances in which there is a policy of a law enforcement agency to obtain statements from criminal suspects in violation of *Miranda*. Such an extension might buy the "benefits" of the "impeachment process" "in assessing" a criminal defendant's "credibility" as a witness. (*Harris* v. *New York, supra,* 401 U.S. at p. 225 [91 S.Ct. at p. 645].) But it would exact a great cost from *Miranda,* and ultimately from the Fifth Amendment privilege against self-incrimination itself. For the agency would then be allowed to respect, or to dishonor, the suspect's rights, and to fulfill, or to breach, its own obligations, and to do so as it should see fit. So long as *Miranda* remains vital—a determination that is fortunately not within the agency's competence—such a result would be absurd.

In conclusion, because I do not believe that there was any reversible error at trial, I concur in affirming the judgment of the Court of Appeal.

Appellant's petition for a rehearing was denied June 24, 1998.