Filed 1/21/14  P. v. Mays CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055989 |
| v. | (Super.Ct.No. BLF004795) |
| KIMBERLY KYLE MAYS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed.

Mary Woodward Wells, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Theodore Cropley and Julianne Karr Reizen, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Defendant Kimberly Kyle Mays appeals from her conviction of second degree murder (Pen. Code,[1] § 187, subd. (a), count 1), possession of a firearm by a felon (former § 12021, subd. (a)(1),[2] count 2), and infliction of corporal injury on a cohabitant (§ 273.5, subd. (a), count 3), with true findings on allegations as to count 1 under sections 12022.5, subdivision (a) and 12022.53, subdivision (d) and a prison term prior allegation under section 667.5, subdivision (b).

Defendant's sole contention on appeal is that the trial court erred in finding that her statement which was obtained in violation of *Miranda*[3] was voluntary and admissible to impeach her testimony at trial. We conclude that any error was harmless beyond a reasonable doubt, and we affirm.

# II. FACTS AND PROCEDURAL BACKGROUND

## A. Prosecution Evidence

Early in the morning of May 1, 2008, defendant's mother, Patricia Gallo, called 911 to report a "man down" at defendant's residence in Blythe. When sheriff's deputies arrived at 2:36 a.m., Gallo and defendant seemed "[f]airly calm." The deputies found the body of Sergio Lopez face down on the living room floor. Lopez had bruises and

---

[1] All further statutory references are to the Penal Code.

[2] Former section 12021, subdivision (a)(1) was repealed and replaced without substantive change by section 29800, subdivision (a)(1), effective January 1, 2012.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

abrasions on his face and gunshot wounds to his chest and hip. The coroner determined that Lopez had died from the wound to his chest, which had pierced his heart.

Defendant told the deputies she arrived home between 1:00 and 1:30 a.m. and discovered Lopez's body. She thought he was drunk and passed out, and she and her mother shook him to see if he would respond.

The deputies found a .22-caliber shell casing next to or under Lopez's body, a second shell casing in the living room between the body and a loveseat, and a third shell casing in the doorway to a bedroom. Three live rounds of ammunition were found near the loveseat. There was a bullet hole in the wall behind and above the loveseat near Lopez's body. There were blood droplets on the floor of the bathroom. The deputies located a plastic bag containing a .22-caliber rifle, two expended .22-caliber casings, and additional live .22-caliber ammunition; the bag had been hidden in an old septic tank. The deputies determined that the .22-caliber rifle had been used in the shooting. The single-shot bolt action rifle had to be manually reloaded each time it was fired: "[Y]ou have to pull the bolt back, opening up the chamber, actually place the round inside the weapon, and close the bolt to fire it." Defendant had a live .22-caliber bullet in her pocket when she was booked.

At the sheriff's station for questioning, Gallo initially told the investigators that defendant had been at her house the evening before the shooting. Gallo said she drove defendant home, and after dropping defendant off, she realized that defendant had left her purse in Gallo's car. Gallo returned to defendant's house and found defendant outside. Defendant told Gallo that a man was drunk inside her house. Later, Gallo admitted

3

defendant had not been at her house that evening, but instead had telephoned Gallo to tell her that she had shot Lopez and needed Gallo's help. Gallo admitted she lied to protect defendant. Gallo said that defendant had seemed to be "acting nonchalant" when they discussed the gun used in the shooting.

After Gallo was interviewed, she and defendant were placed in a room together, and their conversation was recorded; the recording was played for the jury. Defendant said to Gallo, "I was only trying to scare 'em mom, I didn't even think I hit 'em. She also said, "The one time I just shot and he stood up. And then he walked out of the bathroom and I was just going to shoot towards the wall, just to scare 'em, 'cause he was making me so mad, and he came out. What are the chances, huh?" When Gallo said she did not know, defendant responded, "My luck." During the conversation, defendant never said she was scared for her life or that she thought Lopez was going to hurt her.

At trial, Gallo testified that on April 30, 2008, defendant and her ex-boyfriend, Steven Vandiver, had visited Vandiver's mother at the hospital in Indio. Sometime between 11:30 p.m. and midnight, defendant called Gallo and asked her to come over because something had happened; defendant was "hysterical." When Gallo arrived, she saw Lopez lying on the floor in the hallway near the bathroom; defendant said she thought she had hurt him. Gallo did not see any wounds or blood on him; she testified it looked like he had passed out drunk. Defendant said, "'Mom, I shot him.'" Gallo and defendant rolled the body over and dragged it into the living room to see if Lopez would regain consciousness. Gallo testified that defendant told her Lopez had "entered her house unwelcomed," and that "[h]e came in and he was drunk, naturally, and she was

4

afraid he was going to hurt her again. And she was afraid, and she was angry that he wouldn't leave the residence. . . . She has a little dog, and he threatened to hurt that dog. And when he threatened [the dog], she went ballistic." Gallo testified that she knew Lopez had beaten defendant "a lot of times."

Gallo saw a gun lying on the coffee table in the living room, and she told defendant to hide it because she did not want defendant to get into trouble. Defendant hid the gun in the septic tank, and Gallo called 911. Gallo testified that she suggested they tell the officers that defendant had been at Gallo's house that night. However, Investigator Joshua Button later testified that Gallo told him defendant had been the one who wanted to cover up the crime. Defendant also had told Gallo she was afraid Lopez would hurt her. However, Gallo conceded she never told the deputies that defendant had indicated she had shot Lopez because she was scared of him.

Deputy Button testified that he had seen scratch marks on defendant's left arm on May 1, 2008.

### B. Defense Evidence

Defendant presented evidence of two domestic violence episodes she had reported to law enforcement. In September 2007, defendant had a black eye and bruising, which she told deputies had been inflicted by Lopez. In December 2007, defendant reported that Lopez had slapped her and he was arrested, although apparently no criminal charges had been filed for either incident. Defendant had also reported domestic violence

5

incidents in other relationships in 1998 and 1994 or 1995. The police had also been called twice when defendant struck other men she had dated.

Defendant's son, Timothy Mays, testified that on the day of the murder, he, Vandiver, and defendant visited Vandiver's mother in the hospital. When they brought defendant home, they noticed the screen door was partially open and defendant's dog was missing. Defendant was sad and angry, and she told her son and Vandiver to leave. Timothy conceded he had never told the deputies that the dog was missing.

A friend of defendant testified that Lopez had told him about doing "hits for the Mexican Mafia." The friend had seen bruises and scratches on defendant "[a]t least six or seven times" between May 2007 and May 2008. Lopez did not like defendant's dog.

Defendant testified in her own behalf. She had been under psychiatric care for the previous 14 or 15 years, and she took prescription medications for bipolar disorder, manic-depressive disorder, and schizophrenia. She also suffered from short-term memory loss.

She dated Lopez for about a year before the shooting, and he spent several nights a week at her house. The relationship quickly became "rocky"; she had thrown Lopez out of her house several times and had called the police about five times. Both defendant and Lopez were heavy drinkers, and Lopez was very jealous. Lopez had beaten her badly around Thanksgiving. Defendant did not call the police more often because Lopez was a "three-striker," and she did not want to be responsible for putting him away for the rest of his life. She had regularly let him stay at her house or submitted to sex with him to avoid fighting, arguing, and getting hurt. She was five feet tall and weighed 110 pounds.

Lopez was a boxer who bragged about his prowess, and he shadowboxed when he was angry and drunk.

Before the shooting, defendant's father had moved some items into her spare bedroom; those items included a tool chest that contained a .22-caliber rifle and another gun. Lopez and defendant had previously fired the rifle outside.

A few days before May 1, 2008, defendant wrote a letter to Lopez asking him to stay away; she taped it to the front door. A day or two before the shooting, Lopez left defendant's house because he was upset she was spending time with Vandiver. Defendant told Lopez not to come back. On April 29, defendant and Vandiver visited Vandiver's mother at the hospital and then spent the night together at a motel.

The day of the shooting, defendant drank a 40-ounce King Cobra malt liquor when she woke up. She, Vandiver, and their son Timothy visited Vandiver's mother in the hospital. She continued to drink throughout the day. Vandiver drove her home that evening. She noticed a table beside her bed was broken, and her dog and cell phone were missing. She was scared, upset, and angry. She drank while she cleaned up the house.

Lopez came to the house with her dog. He was angry with her, and she was afraid he would hurt the dog because he did not like it and was jealous of it. He threw the dog on the ground; the dog cried, and they began to argue. Lopez grabbed her arm, causing scratches, and she pulled away. She went to the spare bedroom to get the gun because she "wanted to scare him." She was afraid Lopez would hurt her, and she wanted him to leave. She did not remember if the gun was loaded when she grabbed it. She also put ammunition in her pocket. She returned to the living room and sat down on a couch

7

across from Lopez, who was sitting on the loveseat. She asked him to leave, and he laughed and taunted her to shoot him. He appeared angry. She fired a shot into the wall behind him to scare him and make him leave. He said, "'Look what you've done,'" but he did not leave, and she became more scared. She reloaded the gun. Lopez looked at her and stood up, and she got scared and fired a second shot at him. He turned and went toward the bathroom.

Defendant continued to be afraid because Lopez would not leave. She remained seated on the couch, and she reloaded the gun while Lopez was in the bathroom. When he came out quickly, he startled her. She fired the gun, and he fell face down in the hallway. She had meant to scare him, not to kill him.

Defendant panicked and went to a friend's house to call Gallo. When Gallo arrived, they dragged Lopez's body to the living room. They agreed they could not tell the truth about what had happened, and they came up with an alibi. They went to defendant's father's house to ask him what to do, and he told them to call 911. They did so. She lied to the police because she was scared and did not want to believe she had shot Lopez. She lied and minimized the extent of past domestic violence with Lopez because she felt bad, and she did not want to "speak ill of the dead."

Defendant testified that on the night of the shooting, she had been drinking for three days straight and had not taken her medications. She admitted prior felony convictions for burglary, embezzlement, and spousal abuse. She stated she had been truthful in her trial testimony.

8

On cross-examination, defendant admitted she shot Lopez because she was upset that he had taken her dog and cell phone. She admitted she never told the police that she believed Lopez was going to hurt or kill her that night. She admitted telling the police that Lopez had not hurt or touched her since the incident in which he had given her a black eye, and that she and Lopez had only been involved in three fights during their relationship. She testified those statements had been lies.

Defendant admitted that she drank a lot and that she had physical altercations with previous boyfriends during which she had hit them. She admitted slapping Lopez in the past.

Dr. Michael Kania, a psychologist, stated his opinion that defendant suffered from battered woman syndrome, which describes characteristics explaining why a person may react to certain circumstances in an abusive relationship. He also stated his opinion that defendant had suffered from posttraumatic stress disorder (PTSD) for 10 years. He based those opinions on his interview of defendant and on police and medical records. He admitted it is "very uncommon" for a battered woman to initiate the violence.

### C. Prosecution Rebuttal

Investigator Button was recalled to provide brief rebuttal after defendant testified. The investigator testified that defendant first told him she had been at Gallo's house the night of the shooting. About three hours into the interview, defendant admitted shooting Lopez; however, she never said she shot Lopez because she was afraid of him. Defendant told Investigator Button about the incident during which Lopez had given her black eyes, and she said he had not hit her again after that incident. Defendant said she

9

had been upset "[b]ecause she came home, her dog was missing, her cell phone was missing, and there was a broken table in her house." Defendant said that Lopez entered the house and threw the dog on the ground; however, she said the dog had not made any sound. She said Lopez had asked her what she was doing, and she replied, "'Shooting. Shooting a gun.'" She had also told Lopez, "'I don't want you beating up on me no more.'" Defendant said both that she did not realize she had shot Lopez and that she believed she had. She always maintained that her intent had been to scare Lopez.

### D. Stipulations

The prosecution and defense stipulated that five shell casings found in defendant's house and the bullet recovered from Lopez's body came from the .22-caliber rifle that was recovered from the septic tank. Defendant's hands tested positive for gunshot residue, and both defendant and Lopez had alcohol in their systems at the time of the shooting.

### E. Verdict and Sentence

The jury found defendant guilty of second degree murder (§ 187, subd. (a), count 1) possession of a firearm by a felon (former § 12021, subd. (a)(1), count 2), and infliction of corporal injury on a cohabitant (§ 273.5, count 3), and found true allegations as to count 1 under sections 12022.5, subdivision (a), and 12022.53, subdivision (d). The trial court found true the allegation of a prison term prior. (§ 667.5, subd. (b).)

The trial court sentenced defendant to 15 years to life on count 1, with a consecutive enhancement of 25 years to life for the weapon use (§ 12022.53, subd. (d)) as to that count. The court imposed a consecutive sentence of two years for count 2 and

imposed and stayed under section 654 a concurrent term of four years for count 3. Finally, the court imposed a consecutive term of one year for the prison term prior.

Additional facts are set forth in the discussion of the issues.

## III.  DISCUSSION

Defendant contends the trial court erred in finding that her statement which was obtained in violation of *Miranda* was voluntary and admissible to impeach her testimony at trial.  Specifically, defendant contends that four statements of Lieutenant Brandon Ford during the interrogation sent a misleading message and psychologically coerced her into admitting she had killed Lopez:  (1) calling her a liar; (2) equating the truth with being a "witness" and with freedom; (3) pressuring her to think about where she wanted to be at the end of the day; and (4) challenging her to choose between being a witness and being a suspect.  She further argues that "the officers' deliberate violation of *Miranda*, [her] lack of sleep, heavy drinking, diagnosed mental disorders," and failure to take her prescribed medications, caused her confession to be involuntary.

### A.  Additional Background

Defendant moved before trial to exclude her statement to the deputies as having been taken in violation of *Miranda* and as involuntary.   At the hearing on her motion, defendant called Dr. Richard Leo, a professor of law at the University of San Francisco, to testify as an expert witness on police investigation, psychological coercion, and involuntary confessions. He testified that when Lieutenant Ford asked defendant whether she wanted to be a witness or a suspect, her will was so overborne that she had no choice but to confess to murdering Lopez.  He also testified the statement was an implicit

11

suggestion that she would benefit from going along with what the investigator was saying and would possibly avoid arrest and incarceration. On cross-examination, Dr. Leo conceded that the suspect-versus-witness technique, accusing a suspect of lying, challenging a suspect, and lying about discovering evidence, were accepted law enforcement practices that are not inherently coercive. Furthermore, he conceded that the fact that an interrogation is stressful does not make it coercive. He had never spoken to defendant before testifying. He testified that his sole reason for his opinion that the interrogation had been coercive was the use of the suspect-versus-witness technique.

Investigator Albert Loureiro testified he had arrived at defendant's house just before 3:00 a.m. on May 1, 2008. Three other officers were already there. The investigator told defendant and her mother that they were "important people in [the] investigation," and the officers "needed their full cooperation to the full extent." Gallo told him defendant had been with her all day. Defendant was patted down, and she and her mother were placed in separate patrol cars. Defendant was not handcuffed, but she was locked in the back seat of the patrol car, and she was told that if she needed anything, she should knock on the window. The investigator told defendant she was not under arrest. There was a delay transporting defendant to the sheriff's station because Gallo felt sick, and an ambulance was called to transport her to the hospital.

Investigator Joshua Button testified that he arrived at the sheriff's station after 7:00 a.m. on May 1, 2008. He was wearing civilian clothing, but he also wore a badge and carried a firearm in his belt. When he entered the interview room at about 9:00 a.m., defendant was covered in a blanket and was dozing. She said she was tired and wanted to

12

go home, and she asked about her mother, who had been taken to the hospital because of an asthma attack. He told her that her mother was fine. He said she was not under arrest and was free to leave. She did not appear to be impaired in any way, and she seemed able to understand his questions. She responded to the questions in a logical fashion, and she was not slurring her words. The investigator spoke to defendant for approximately six to eight hours with breaks.

Lieutenant Ford testified that he monitored Investigator Button's interview of defendant. After an hour or so, he entered the interview room and began interrogating defendant himself. He was wearing a suit and a badge. He had a gun, but it was concealed on his ankle. He told defendant he believed she was lying because her story did not make sense. He did not say she would be arrested if she did not give him a logical statement; he did not make any promises to her.

After viewing the videotape of defendant's interview, the trial court ruled that defendant had been taken into custody at her home when she was placed in a locked police car and then held in the interview room at the sheriff's department. The trial court ruled defendant should have been given her *Miranda* rights before the interview began, and her statements both before and after the *Miranda* advisements were therefore inadmissible in the People's case-in-chief. The court further ruled that defendant's statement was not coerced or involuntary because there was only a "brief indication of whether or not she wants to be a witness or a defendant"; the fact that she gave up incriminating information meant she knew she was not going to be a witness; and she had

13

been through the system before. Thus, the statement was admissible to impeach defendant's testimony.

## B. Standard of Review

On appeal, we apply the substantial evidence standard of review to the trial court's findings as to the circumstances surrounding the confession, including the characteristics of the defendant and the details of the interrogation. (*People v. Benson* (1990) 52 Cal.3d 754, 778-779.) We independently review the trial court's conclusion as to the voluntariness of the confession. (*People v. Boyette* (2002) 29 Cal.4th 381, 411.)

## C. Analysis

"[A] statement taken in violation of [*Miranda*] is inadmissible at trial in the prosecution's case-in-chief, but is admissible to impeach the defendant's credibility as a witness, so long as the statement otherwise is voluntary. [Citations.]" (*People v. Peevy* (1998) 17 Cal.4th 1184, 1188.) "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." (*Harris v. New York* (1971) 401 U.S. 222, 226.)

"'Under both state and federal law, courts apply a "totality of circumstances" test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are '"the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'" [Citation.]" (*People v. Boyette*, *supra*, 29 Cal.4th at p. 411.)

14

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." (*Colorado v. Connelly* (1986) 479 U.S. 157, 167; see also *People v. McWhorter* (2009) 47 Cal.4th 318, 347.) Moreover, the coercive police activity must be causally related to the defendant's statement. (*People v. Williams* (2010) 49 Cal.4th 405, 437.) "'In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.]' [Citation.]" (*Id.* at p. 436.)

## D. Violation of *Miranda*

Defendant contends the officers deliberately violated *Miranda*.[4] However, even a deliberate violation of *Miranda*, without more, does not render a confession involuntary and require exclusion for impeachment purposes. For example, in *People v. Peevy*, *supra*, 17 Cal.4th 1184, officers admitted they had intentionally violated the defendant's *Miranda* rights by continuing to question him after he requested counsel; the officers hoped to obtain impeaching evidence. (*People v. Peevy*, *supra*, at pp. 1189-1190.) The court held the defendant's statements were nonetheless admissible for impeachment. (*Id.* at pp. 1196-1202; see also *People v. Demetrulias* (2006) 39 Cal.4th 1, 29-30 [officers failed to honor the defendant's invocation of his right to remain silent, but statement was

---

**4** The trial court held that the officers had violated *Miranda* by failing to give admonishments before the interrogation began; however, the trial court made no finding as to whether the violation had been deliberate.

nonetheless voluntary and admissible for impeachment].)  Here, likewise, we conclude the failure to administer timely *Miranda* warnings did not render defendant's statements involuntary.

## E.  Witness-versus-suspect Comparison

Defendant argues that Lieutenant Ford's use of the witness-versus-suspect comparison was a deceptive and coercive interrogation technique that rendered her confession involuntary.  She contends the comparison implied a promise of leniency in exchange for her confession.  Our review of the transcript of the interview convinces us that the lieutenant was merely pointing out that defendant's story was inconsistent and unreasonable.  He questioned why she was lying and asked her to tell the truth.  "'"[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.'"  [Citation.]'"  (*People v. McWhorter*, *supra*, 47 Cal.4th at p. 357.)

Moreover, during the interview, the officers asked defendant numerous questions regarding the possible involvement of defendant's sons, Vandiver, or other family members.[5]  Notably, the first thing defendant said when placed in the interview room

---

[5] Investigator Button asked if Lopez had been in any recent fights with defendant's family members, if he had any problems with either of defendant's sons, or if he had any problems with Vandiver.  The investigator asked how Lopez got along with defendant's father, stepfather, mother, and son Brandon.  He asked about possible jealousy between Vandiver and Lopez and asked if it was possible that Lopez and Vandiver had an argument.  He again asked if there had ever been an argument between Lopez and Vandiver.  Lieutenant Ford also asked if Lopez and Vandiver had had any

*[footnote continued on next page]*

with Gallo was, "They were thinking I was covering up for Brandon or [Vandiver] or somebody." Thus, in context, the witness-versus-suspect question appears to have been directed at least in part to the possibility that defendant was shielding another person rather than a technique designed to induce her to confess her own guilt.

Defendant relies heavily on her own characteristics and circumstances, including "lack of sleep, heavy drinking, diagnosed mental disorders," and failure to take her prescribed medications to support her argument that her statement was coerced. During the interview, she told the officers that she was "schizophrenic, bipolar, and all that." Dr. Leo testified he had reviewed a report that indicated defendant had chronic schizophrenic condition, PTSD, and anxiety disorder, but no medical documentation or other evidence was introduced at the hearing to substantiate those diagnoses; rather, defendant cites only to evidence from her trial. She has therefore forfeited a claim that such evidence supported a finding of involuntariness. (*People v. Rundle* (2008) 43 Cal.4th 76, 121, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) Moreover, nothing in the record indicates that defendant's mental disorders materially affected her ability to make a voluntary statement.

---

*[footnote continued from previous page]*

fights. He asked if there would be any evidence, such as fingerprints or DNA, showing that Vandiver had been in defendant's bedroom or if there would be any "evidence of [Vandiver] on [Lopez]." Lieutenant Ford told defendant, "that's not reasonable that your boyfriend gets killed in your living room, or is dead in your living room, and you don't know who did it. Right about the time your baby's daddy gets out of prison and you're off screwing him in a hotel room. You see how that looks?"

Defendant further argues she had been drinking "three days straight" before the interview. She had told the officers she had been drinking intermittently the past few days and had been "drinking a lot during the day" before the shooting. She argues she was visibly shaking from alcohol withdrawal by the time she admitted the murder. Near the end of the interview, Lieutenant Ford noted she was shaking, and she responded that it was because of her nerves or because she had not had a drink in a while. In *People v. Weaver* (2001) 26 Cal.4th 876, the defendant suggested his statements were involuntary because he had been under the influence of medication. The court rejected the claim, explaining, "The due process inquiry focuses on the alleged wrongful and coercive actions of the state . . . and not the mental state of defendant. [Citation.] Because the trial court determined that neither officer engaged in wrongful conduct, the mere fact defendant was taking medication prescribed by the prison medical staff is insufficient to establish a claim of involuntariness. [Citations.]" (*Id.* at p. 921.) The same analysis applies to defendant's consumption of alcohol.

Defendant argues that several officers at the scene knew her family well and had responded to other 911 calls from her home over the years and that Lieutenant Ford and Investigator Button "did not hesitate" to use that information to their advantage. However, that evidence was presented at trial through Gallo's testimony; it was not presented at the evidentiary hearing. Moreover, defendant has not provided any persuasive explanation of how that fact made her statement involuntary.

As to defendant's other characteristics, she was 45 years old when she made her statement. She had previously been convicted of burglary, embezzlement, two separate instances of corporal injury on a spouse, among other crimes, and had previously served time in prison; thus, she was familiar with the criminal justice system.

As to the conditions of the interview, the officers offered defendant multiple breaks and opportunities to use the restroom. She was offered food and drink, and when she requested a soda, one was provided to her. She was never placed in handcuffs. The two interrogators were dressed in civilian clothes and remained seated during the interview. The interview was indeed lengthy, and defendant had a lengthy wait at the sheriff's station before it began because the interviewers had to be summoned from their distant homes. However, the length of an interview does not render a defendant's statement inherently involuntary.

Defendant relies on *People v. Flores* (1983) 144 Cal.App.3d 459, in which the court held that a defendant's statement was involuntary. The police told the defendant, who was suspected of murder, "'we need you to help yourself out of this mess'"; that statement followed statements about the death penalty, and the clear implication was that "[o]nly by confessing his involvement in the decedent's death could the appellant avoid the possible death penalty." (*Id.* at p. 471.) Here, unlike in *Flores*, the record shows no discussion of possible penalties, let alone a discussion of the death penalty.

Considering all the circumstances, we conclude the trial court did not err in determining that defendant's statement was voluntary.

19

**F. Harmless Error**

Even if we were to assume the trial court erred in concluding that defendant's statement was voluntary, we review such error "in the context of other evidence presented" to determine whether the admission of her statement was harmless beyond a reasonable doubt. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 308.) In other words, the burden is on the government "to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.) In *People v. Mil* (2012) 53 Cal.4th 400, the court explained the standard as follows: "[O]ur task in analyzing the prejudice from the . . . error is whether any rational fact finder could have come to the *opposite* conclusion." (*Id*. at p. 418, original italics.) Defendant argues that this standard cannot be met because the admission of her "prior inconsistent statements left the damaging impression, whether it was true or not, that she was skewing her trial testimony to present herself in a more sympathetic light and thus, was not worthy of belief."

Defendant argues that "the evidence of her prior inconsistent statements concerning the extent and frequency of domestic abuse inflicted by Lopez [citation], whether she responded at the time of the shooting to a certain 'look' in Lopez's eye [citation], or if she told police she shot Lopez out of fear of being hurt or killed [citation] had to have been damaging to her credibility and most certainly affected the jury's consideration of the critical issue of [her] mental state at the time of the shooting."

To determine whether defendant was prejudiced, we must first identify which specific portions of her pretrial statements were in fact presented to the jury. Neither a

20

recording nor a transcript of defendant's statement was admitted into evidence; rather, the prosecutor cross-examined defendant on inconsistencies in her various statements and testimony, and Investigator Button testified briefly on rebuttal about pretrial statements defendant made that were inconsistent with her trial testimony.

With respect to her statements about prior domestic abuse by Lopez, before Lieutenant Ford even entered the interview room, defendant had told Investigator Button that Lopez had beaten her up four or five months earlier and had given her black eyes, but "[h]e never hit [her] again after that." Defendant's arguments that similar statements were involuntary are entirely based on Lieutenant Ford's later statements and interrogation techniques; those arguments simply do not apply to her earlier statements to Investigator Button.

With respect to defendant's failure to tell the officers that she shot Lopez because she feared being hurt or killed, she also failed to tell that to her own mother.

Even in the absence of the challenged testimony, other evidence called defendant's credibility into serious question. First, her conduct after the murder was significant— instead of calling 911, she called her mother and asked for help to "cover it up." She hid the rifle and bullets in the septic tank, and she and her mother concocted an alibi.

Next, her credibility was damaged by the manner of the killing: the rifle had to be manually reloaded each time it was fired; specifically, for each shot, the used shell casing had to be removed, a new bullet placed in the chamber, and the bolt closed. Thus, she had time to reflect before firing the rifle three separate times. Defendant was familiar

21

with the rifle and had recently fired it. In addition, defendant had no physical injuries apart from a scratch on her arm.

Gallo's testimony also damaged defendant's credibility. During her police interview, Gallo at first lied to protect defendant and claimed that defendant had been with her that evening. She then admitted that defendant shot Lopez and had called her to ask for help. Gallo testified at trial that defendant said she had gone "ballistic" when Lopez threatened her dog. Defendant repeatedly said she wanted to cover it up. Gallo described defendant as "nonchalant" when discussing the gun used. Defendant never told Gallo she had shot Lopez because she was scared of him. Instead, in the recorded conversation between Gallo and defendant at the police station, defendant admitted she had shot Lopez because she was mad: "The one time I just shot and he stood up. And then he walked out of the bathroom and I was just going to shoot towards the wall, just to scare 'em, 'cause he was making me so mad, and he came out. What are the chances, huh? [¶] My luck."

Finally, defendant was impeached with prior felony convictions for burglary, embezzlement, and spousal abuse. She admitted she had struck previous boyfriends. She admitted she had lied to the officers "for quite a while" during the interrogation.

We conclude that any error in the admission of defendant's pretrial statements was harmless beyond a reasonable doubt.

22

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

_____HOLLENHORST_____
J.

We concur:


_____RAMIREZ_____
P.J.

_____CODRINGTON_____
J.