Filed 12/17/21  P. v. Crawley CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C091085 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE018733) |
| v. | |
| COREY CRAWLEY, | |
| Defendant and Appellant. | |

A jury found defendant Corey Crawley guilty of second degree murder and being a felon in possession of a firearm, and found true allegations that he personally and intentionally discharged a firearm causing death.  The trial court sentenced defendant to 43 years to life in state prison and imposed various fees and fines.  Defendant appeals, arguing (1) the trial court erred in denying his *Batson/Wheeler*[1] motion, (2) the

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 173.

1

prosecutor engaged in misconduct in rebuttal closing argument, (3) remand is necessary to allow the trial court to exercise its discretion to strike the firearm enhancement for personal use and discharge of a firearm causing death and impose a lesser firearm enhancement in its place, and (4) the trial court erred in imposing various fines and fees without determining his ability to pay. We reject these contentions and affirm the judgment.

## I. BACKGROUND

### A. *The Shooting*

Defendant and an associate, E.V., spent much of their time at an apartment complex in Sacramento, which was known as a gathering place for "Trigga Mob" gang members. Neither defendant nor E.V. lived in the apartment complex. Nevertheless, they acted as self-appointed guardians of the complex, joining gang members in approaching unfamiliar cars and demanding to know who the occupants were and why they were there. Defendant was often seen running up to cars pulling into the apartment complex parking area with a silver revolver in his hand.

Defendant argued with a man named "E." on October 7, 2017. The argument escalated, and defendant reached for a shiny silver-gray gun in the waistband of his pants. Bystanders intervened and the men calmed down, bringing the conflict to an end. The peace, however, was short-lived.

D.R., a resident of the apartment complex, returned home in the early morning hours of October 8, 2017, after an evening out. He ran into defendant and E.V., who invited him to play dice. D.R. agreed, and the three men played dice in the courtyard area. Defendant lost a couple of dollars. He then got up and walked away through the gates of the apartment complex. D.R. and E.V. continued to shoot dice. A couple minutes later, D.R. heard six or seven shots. Defendant then came running back into the apartment complex towards D.R. and E.V., tucking a silver revolver into his pants as he ran. Defendant said to E.V., "come on, let's go." E.V. said, "what did you do?"

2

Defendant repeated, "come on, let's go." Defendant and E.V. then left the apartment complex.

D.R. went to his apartment. He then went back outside and through the gates of the apartment complex to the street. D.R. saw a gray car with the doors open and interior light on. There were several bullet holes in the car.

B. *The Investigation and Arrest*

Sacramento County sheriff's deputies responded to a report of shots fired near the apartment complex. They found a Chevy Malibu with bullet holes in the driver's side door and window. They also found paperwork indicating the car had been rented by J.R., a resident of the apartment complex. J.R.'s body was found several hours later, approximately 100 yards from the car. An autopsy would reveal that J.R. had been shot three times. One of the bullets passed through J.R.'s stomach and other organs, ultimately causing death.

Defendant and E.V. fled the apartment complex by car, accompanied by defendant's girlfriend. They were apprehended the next day. Sheriff's deputies found a gun in defendant's girlfriend's purse. A criminalist would later compare bullets recovered from J.R.'s rental car and body to the gun found in defendant's girlfriend's purse. The criminalist determined that one of the bullets was fired from the gun; the other bullets were too damaged to be meaningfully evaluated.

C. *The Charges and Jury Trial*

Defendant was charged by amended information with first degree murder (Pen. Code, § 187—count one)[2] and being a felon in possession of a firearm (§ 29800, subd. (a)(1)—count two). The amended information also alleged as to count one that defendant

_____

[2] Undesignated statutory references are to the Penal Code.

3

intentionally and personally discharged a firearm causing death. (§ 12022.53, subds. (b)-(d)). Defendant pled not guilty and denied the allegations.

The matter was tried to a jury in July 2019. The prosecution's witnesses testified substantially as described *ante*. Defendant did not testify or present any witnesses.

The jury returned a verdict after five hours of deliberation. The jury found defendant not guilty of first degree murder but guilty of second degree murder. The jury found defendant guilty of being a felon in possession of a firearm and found true the allegations that he intentionally and personally discharged a firearm causing death. The trial court sentenced defendant to 15 years to life for second degree murder, plus 25 years for the firearm enhancement under section 12022.53, subdivision (d), staying the sentences on the remaining firearm enhancements, and three years for being a felon in possession of a firearm, for an aggregate prison term of three years plus 40 years to life. The trial court also imposed various fees and fines. This appeal timely followed.

## II. DISCUSSION

*A.*     Batson/Wheeler *Motion*

Defendant argues the trial court erred in denying his *Batson/Wheeler* motion. He argues the prosecutor improperly exercised one of her peremptory challenges to excuse an African American male prospective juror (Prospective Juror No. 5), resulting in a jury that appears to have had no African American males.[3] We perceive no error.

*1.     Additional Background*

Jury selection took place over three days. The trial court initially called a panel of 65 prospective jurors, 18 of whom were excused for hardship or cause.[4] The trial court then called an augmented panel of 35 prospective jurors, 12 of whom were excused for

---

[3] As we shall discuss, the trial court found that defendant was likely African American, as was the victim.

[4] Of these, one was Prospective Juror No. 6, who we will discuss shortly.

hardship or cause, and two of whom deferred their service. The trial court then merged the two panels into a pool of 68 prospective jurors, one of whom was excused for cause.

We have limited information concerning the racial composition of the jury pool. What little information we have derives from defense counsel's argument in support of the *Batson/Wheeler* motion (which we discuss in greater detail momentarily), in which he represented that four African Americans had been included in the original panel: two males and two females.[5] Prospective Juror No. 6, who appears to have been one of the two African American males, was excused for hardship by stipulation of the parties, leaving Prospective Juror No. 5 as the only apparent African American male remaining on the original panel.[6] We have not been provided with any information concerning the racial composition of the augmented panel or empaneled jury.

Prospective Juror No. 5, who would become the subject of the *Batson/Wheeler* motion, was a fulltime student from Citrus Heights. He was single with no children. When asked whether he was familiar with the concept of snitching, Prospective Juror No. 5 responded in the affirmative. When asked how he came to know about snitching, Prospective Juror No. 5 responded, "Friends, people."

During voir dire, the prosecutor asked whether any of the prospective jurors were uncomfortable with the idea of deliberating as a group. Prospective Juror No. 5 appears to have been the only prospective juror to respond, stating, "I don't talk a lot. I'm kind of shy, so, yes." The following colloquy occurred:

"[THE PROSECUTOR]: Okay. So, if you were chosen as a juror, and you were asked to go back with your fellow jurors and deliberate together, would that be a

---

[5] Defense counsel specifically referred to the "original panel," which we understand to mean the original panel of 65 prospective jurors.

[6] Defendant acknowledges that Prospective Juror No. 5 and Prospective Juror No. 6 were seated next to one another by chance.

comfortable enough process that you could sit there and listen and chime in, if you had an idea?

"[PROSPECTIVE JUROR NO. 5]: To be honest, I wouldn't talk unless I was talked to, so, yeah.

"[THE PROSECUTOR]: Would you be able to feel involved even if you didn't talk a lot, that you would be listening, and you'd form an opinion based on the overall discussion and your interpretation of the evidence?

"[PROSPECTIVE JUROR NO. 5]: Yeah.

"[THE PROSECUTOR]: Okay. Great."

The parties then began exercising their peremptory challenges. The prosecutor exercised her third peremptory challenge to excuse Prospective Juror No. 5. Defense counsel then made the *Batson/Wheeler* motion.

Defense counsel began his argument by stating that Prospective Juror No. 5 and defendant were both young, African American males. Defense counsel continued, "And the original panel that had come up from the Jury Commissioner, I noticed that there were essentially two African American males and two African American females."[7] Defense counsel estimated that Prospective Juror No. 5 was "probably under 25," adding that he was a "college student at a local community college, where he is studying engineering." Defense counsel acknowledged that Prospective Juror No. 5 was familiar with the concept of snitching, but observed he was no more familiar with the concept than the average person. Defense counsel concluded by arguing there was nothing in Prospective Juror No. 5's responses to suggest he would be unable to serve as an unbiased juror. The prosecutor declined the trial court's invitation to respond to defense counsel's argument.

---

[7] As indicated *ante*, defense counsel's representation appears to be the only information in the record concerning the racial composition of the jury pool.

6

The trial court then ruled on the motion. The trial court began by confirming with defense counsel that the motion was based on race. The trial court then found that Prospective Juror No. 5 appeared to be African American, and defendant also appeared to be African American, and thus, both appeared to be members of the same cognizable group. (See *People v. Clair* (1992) 2 Cal.4th 629, 652 [holding that African Americans are a cognizable group for *Batson/Wheeler* purposes].) The trial court further found the prosecutor asked Prospective Juror No. 5 the same questions she asked the other prospective jurors and did not ask him "a proportionately different number of questions."

The trial court recognized that Prospective Juror No. 6 may have been African American but found his excusal for hardship was not evidence to support a prima facie showing. "Even if it were," the trial court continued, "the evidence as a whole does not support a prima facie showing." The trial court observed that membership in the same cognizable group as the defendant does not, without more, establish a prima facie case of discrimination. (See, e.g., *People v. Bonilla* (2007) 41 Cal.4th 313, 342-343; *People v. Turner* (1994) 8 Cal.4th 137, 164.) The trial court also observed that the victim, J.R., appears to have been a member of the same group. "Under the totality of the circumstances," the trial court concluded, "the [c]ourt cannot reasonably infer a discriminatory purpose." Accordingly, the trial court denied the motion.

2.      *Applicable Legal Principles*

"The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.) The discriminatory use of peremptory challenges harms not only defendants but also "the excluded jurors and the community at large," as it "forecloses a significant opportunity to participate in civic life" (*Powers v. Ohio* (1991) 499 U.S. 400, 406, 409)

7

and " 'undermine[s] public confidence in the fairness of our system of justice' " (*Johnson v. California, supra*, 45 U.S. at p. 172). "The exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

"We follow a familiar three-step process in evaluating a defendant's *Batson/Wheeler* motion. First, the defendant must make a prima facie case by showing facts sufficient to support an inference of discriminatory purpose. [Citation.] Second, if the defendant makes a prima facie showing, the burden shifts to the prosecutor to offer a permissible, nondiscriminatory explanation for the strike. [Citation.] Third, if the prosecutor offers a nondiscriminatory explanation, the trial court must decide whether that explanation is genuine, or whether impermissible discrimination in fact motivated the strike." (*People v. Battle* (2021) 11 Cal.5th 749, 772.)

The trial court here denied the *Batson/Wheeler* motion at the first step, finding defendant failed to make the required prima facie showing. A defendant makes a prima facie showing by establishing that "the totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' " (*People v. Scott* (2015) 61 Cal.4th 363, 384.) Whether a prima facie showing has been made depends upon "the entire record of voir dire as of the time the motion was made," and "certain types of evidence may prove particularly relevant." (*Ibid.*) "Among these are that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.] A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*Ibid.*)

8

We review the denial of a *Batson/Wheeler* motion at the first step deferentially, "considering only whether substantial evidence supports the trial court's conclusion." (*People v. Battle, supra,* 11 Cal.5th at p. 772.) "In conducting our review, we remain mindful of the 'low threshold' showing required for *Batson*'s first step. [Citation.] This step should not 'be so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.' [Citation.] It is satisfied simply by evidence sufficient to permit us to draw an inference that discrimination *may* have occurred." (*Id.* at p. 773.)

### 3. Analysis

Before we begin our analysis, we observe that defendant confirmed with the trial court that the *Batson/Wheeler* motion was based solely on race, rather than race and gender. We readily acknowledge that African American males constitute a cognizable group for *Batson/Wheeler* purposes (see *People v. Armstrong* (2019) 6 Cal.5th 735, 768), but defendant did not articulate this basis for his motion in the trial court. Defendant suggested the prosecutor was using peremptory challenges to discriminate against African Americans generally, male and female. Defendant did not specifically identify African American *males* as the relevant cognizable group and arguably forfeited the argument he advances here. (See *People v. Cunningham* (2015) 61 Cal.4th 609, 662 [defendant must clearly articulate *Batson/Wheeler* objection to preserve issue]; see also *People v. Cornwell* (2005) 37 Cal.4th 50, 70, fn. 4, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [*Batson/Wheeler* objections that prosecutor was attempting to exclude Hispanic and African American jurors failed to preserve argument that prosecutor was singling out African American females]; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 734 [same].) But even assuming the argument was preserved, we would reject it.

Defendant's claim of discrimination rests on the fact that the prosecutor struck Prospective Juror No. 5, the only apparent African American male remaining after Prospective Juror No. 6 was excused for hardship.[8] Defendant observes that the exclusion of a single juror can violate *Batson/Wheeler* and emphasizes the low threshold for making a prima facie showing.[9] Although these arguments are worthy of careful consideration, they fail to carry the day.

While it is true that "[t]he exclusion by peremptory challenge of a single juror on the basis of race or ethnicity is an error of constitutional magnitude requiring reversal" (*People v. Silva* (2001) 25 Cal.4th 345, 386), the prima facie showing is not made merely by establishing that an excluded juror was a member of a cognizable group. (See *People v. Howard* (2008) 42 Cal.4th 1000, 1018; *People v. Bonilla, supra,* 41 Cal.4th at p. 343.) Rather, " 'in drawing an inference of discrimination from the fact one party has excused "most or all" members of a cognizable group . . . , a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.] Such a pattern will be difficult to discern when the number of challenges is extremely small." (*People v. Bonilla, supra,* at p. 343, fn. 12; see also *People v. Battle, supra,* 11 Cal.5th at p. 776 [" 'Although circumstances may be imagined in which a prima facie case could be shown on the basis of a single excusal, in the ordinary case . . . to make a prima facie case after the excusal of only one or two members of a group is very difficult' "].)

---

[8] Defendant does not challenge the excusal of Juror No. 6.

[9] Defendant also directs our attention to Assembly Bill No. 3070 (2019-2020 Reg. Sess.), which added section 231.7 to the Code of Civil Procedure. (Stats. 2020, ch. 318, §§ 1-3.) The new law, which was animated by concerns that the *Batson/Wheeler* framework has failed to protect against implicit bias in jury selection (Stats. 2020, ch. 318, § 1), will become effective for jury trials in which jury selection begins on or after January 1, 2022 (Code Civ. Proc., § 231.7, subd. (i)), and thus does not apply here.

The prosecutor here challenged one of only two apparent African American males from the original panel of 65 prospective jurors, and the only apparent African American male remaining after Prospective Juror No. 6 was excused for hardship. Although the prosecutor appears to have challenged every African American male remaining in the original panel, the small sample size " ' "makes drawing an inference of discrimination from this fact alone impossible." ' " (*People v. Parker* (2017) 2 Cal.5th 1184, 1212.) Even assuming the sample was complete, and no African American males were included in the augmented panel, " ' " 'the challenge of one or two jurors can rarely suggest a *pattern* of impermissible exclusion.' " ' " (*Ibid.* [prosecutor's peremptory challenges against the only two African Americans in a 136-person pool of prospective jurors was insufficient to support an inference that the prosecutor challenged them on account of their race]; *People v. Harris* (2013) 57 Cal.4th 804, 835 [given lack of African American prospective jurors, the fact that the prosecutor exercised peremptory challenges against the two who had been called to the jury box did not establish a prima facie showing]; *People v. Bonilla, supra,* 41 Cal.4th at pp. 342-343 [prosecutor's peremptory challenges against two African Americans in a pool of 78 prospective jurors did not establish a prima facie case].)[10] Furthermore, though Prospective Juror No. 5 and defendant were

---

[10] Defendant suggests supporting evidence of group-based bias may be found in recent census data, which shows that African Americans represent 10.9 percent of the population in Sacramento County. We question the relevance of this data, given that defendant now purports to define the relevant cognizable group as African American males. But even accepting this data point, defendant does not explain how the county population provides an appropriate reference point for *Batson/Wheeler* analysis. And indeed, Supreme Court precedent suggests it is not. Our Supreme Court has explained: " '[A] more complete analysis of disproportionality compares the proportion of a party's peremptory challenges used against a group to the group's proportion in the pool of jurors subject to peremptory challenge.' " (*People v. Parker, supra,* 2 Cal.5th at p. 1212, fn. 12; see *People v. Bell* (2007) 40 Cal.4th 582, 598, fn. 4, disapproved on another ground in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13 [same].) So far as the record reveals, the prosecutor exercised one out of 16 peremptory challenges against African American males (or 6.25 percent), who in turn constituted one of 47 remaining

both African American men, any inference of discrimination was weakened by the fact that the victim, J.R., was also an African American man. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 115-116 [that the defendant and the victim were the same race supported the trial court's denial of the *Batson/Wheeler* motion]; *People v. Jones* (2017) 7 Cal.App.5th 787, 806 [that the victims were members of the same cognizable group as the defendant supported the trial court's finding that the defendant failed to establish a prima facie case].)

Defendant argues that an inference of discriminatory purpose arose because Prospective Juror No. 5 "objectively was an ideal juror for the prosecution [because] [t]he prosecutor's strike removed the only African-American male remaining in the venire." But our review of the record reveals valid, nondiscriminatory reasons for the challenge. For one thing, Prospective Juror No. 5 was a fulltime student, "probably under 25." Youth and lack of life experience are legitimate reasons to reject a prospective juror. (See *People v. Lomax* (2010 49 Cal.4th 530, 575 [ "potential juror's youth and apparent immaturity are race-neutral reasons"]; *People v. Neuman* (2009) 176 Cal.App.4th 571, 582 [fact that excused jurors were all "young students, inexperienced at life" supported trial court's finding of no prima facie case].) For another thing, Prospective Juror No. 5 was, by his own account, "kind of shy," and unlikely to speak unless spoken to, raising

---

prospective jurors in the original panel (or 2.1 percent), and an unknown proportion of the jury pool as a whole. Again, we are unable to draw any inference of discrimination from such a small sample size, even assuming the sample represents the jury pool as a whole, as opposed to only the original panel. (See *People v. Battle, supra,* 11 Cal.5th at p. 775 [no inference of discrimination where prosecutor used approximately 18 percent of his strikes by the time of the *Batson/Wheeler* motion against African American prospective jurors, who constituted approximately 8 percent of the pool subject to peremptory challenge]; *People v. Bell, supra,* at p. 599, fn. 4 [no inference of discrimination where prosecutor used 12.5 percent of peremptory challenges against African American women, but there were only three African American women in the panel of 47 prospective jurors (or 6.4 percent)].)

questions about his ability to participate in deliberations with other jurors. Prosecutors may "legitimately choose to shy away from . . . unduly timid jurors." (*People v. Duff* (2014) 58 Cal.4th 527, 546.) That Prospective Juror No. 5 described himself as shy and reserved counters any concern that the challenge may have been prompted by subjective, demeanor-related observations that may sometimes provide a pretext for discrimination. (See *People v. Baker* (2021) 10 Cal.5th 1044, 1081 [recognizing that demeanor-based justifications for peremptory challenges may in some cases provide a pretext for discrimination, but concluding this was not the case where the prosecutor's description of the prospective juror's demeanor was uncontroverted].)[11]

Viewing the totality of the record, we conclude substantial evidence supports the trial court's determination that defendant failed to make a prima facie showing the peremptory challenge of Prospective Juror No. 5 was prompted by a discriminatory purpose. We therefore reject defendant's *Batson/Wheeler* challenge.

B.      *Prosecutorial Misconduct*

Defendant next argues the prosecutor engaged in prosecutorial misconduct in closing argument by shifting the burden of proof to the defense. We disagree.

1.      *Additional Background*

During closing argument, the prosecutor reviewed the circumstantial evidence supporting defendant's culpability as the shooter, including his affiliation with the Trigga Mob gang. The prosecutor recounted that members of the Trigga Mob gang patrolled the apartment complex and approached unfamiliar cars in the parking area, often displaying a gun. The prosecutor also reminded the jury that defendant himself had been seen with a

---

[11] Defendant suggests for the first time in his reply brief that the prosecutor engaged in a perfunctory or desultory voir dire of Prospective Juror No. 5. We do not consider arguments made for the first time in a reply brief. (*People v. Peevy* (1998) 17 Cal.4th 1184, 1206.)

gun hours before the shooting. The prosecutor theorized that defendant shot J.R. because he did not recognize J.R.'s rental car.

Defense counsel argued the circumstantial evidence supported the reasonable conclusion that another member of the Trigga Mob gang shot J.R. Defense counsel elaborated: "What has not been excluded in this case is Trigga Mob is supposed to be in this area protecting it. [Trigga] Mob is supposed to be out there checking cars. Trigga Mob is supposed to be doing this actively in their gang territory. [¶] But on one night, according to [D.R.], there were no Trigga Mob members out there. Nobody did anything else, and it was only [defendant] and [E.V.] who were out in that apartment complex." Defense counsel concluded that the prosecution failed to prove beyond a reasonable doubt that defendant was the shooter, as opposed to another member of the Trigga Mob gang.

In rebuttal, the prosecutor argued there was no evidence to support the defense theory that another gang member shot J.R. The prosecutor noted that D.R. testified the shooting took place outside a small apartment complex, late at night, with very few people around. The prosecutor continued: "And note too that the defense attorney has subpoena power just like the People do. If there was a witness out there who saw another person around, you would have heard from them or him." Defense counsel objected to the prosecutor's argument as "[i]mproper burden shifting." The trial court overruled the objection, and the prosecutor continued, stating: "If there was a witness out there that knew of some crazy beef between [J.R.] and another third person, you would have heard from that witness. [¶] If there was a witness out there that would support the defense theory in any way, you would have heard from that person. You didn't because that evidence doesn't exist."

2.    *Applicable Legal Principles*

A prosecutor has significant leeway during closing arguments to argue his or her case vigorously. (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) "A prosecutor may

14

fairly comment on and argue any reasonable inferences from the evidence. [Citation.] Comments on the state of the evidence or on the defense's failure to call logical witnesses, introduce material evidence, or rebut the People's case are generally permissible. [Citation.] However, a prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*People v. Woods* (2006) 146 Cal.App.4th 106, 112; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1340.)

" 'A prosecutor's conduct violates a defendant's constitutional rights when the behavior comprises a pattern of conduct so egregious that it infects " 'the trial with unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Young* (2019) 7 Cal.5th 905, 932.) " 'When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' " (*People v. Rivera* (2019) 7 Cal.5th 306, 334.)

*3.      Analysis*

Defendant acknowledges the prosecutor could properly comment on the defense's failure to call logical witnesses. (*People v. Woods, supra,* 146 Cal.App.4th at p. 112.) However, defendant argues the prosecutor crossed the line by commenting on the defense's failure to call *unavailable* witnesses. Defendant observes that some witnesses were reluctant to testify for fear of retaliation by the Trigga Mob gang. Defendant suggests other potential witnesses may have been unavailable to testify due to the same fear of retaliation. (See generally *People v. Rojas* (1975) 15 Cal.3d 540, 547 [witness who testified he had been subjected to threats and violence was unavailable on grounds of fear for his safety and that of his family]; *People v. Quaintance* (1978) 86 Cal.App.3d 594, 600 [witness who testified he feared for his life was properly declared unavailable]; compare, *People v. Sul* (1981) 122 Cal.App.3d 355, 363 [no evidence of threats or violence to support a finding of witness fear sufficient to render him unavailable].)

15

Relying on *People v. Ford* (1988) 45 Cal.3d 431 (*Ford*), *People v. Stankewitz* (1990) 51 Cal.3d 72 (*Stankewitz*), and *People v. Frohner* (1976) 65 Cal.App.3d 95 (*Frohner*), defendant argues the prosecutor committed misconduct by commenting on the defense failure to call such witnesses, without first establishing that they were available and would be expected to testify favorably to the defense.  None of these cases helps defendant.

In *Ford*, the defendant and three codefendants were charged with burglary.  (*Ford, supra,* 45 Cal.3d at p. 436.)  Before the defendant's trial, a jury convicted two codefendants of being accessories to a felony, the third had not yet been tried.  (*Ibid.*)  During the trial, the defendant testified he was not at the crime scene at the time of the burglary, but with two of the codefendants at one of their homes.  (*Id.* at p. 438.)  During closing argument, the prosecutor commented on the fact that neither of the two codefendants defendant had claimed to be with had been called to support the defendant's alibi defense.  (*Ibid.*)  The trial court granted the defendant's motion for a new trial based on the court's expectation that the codefendants would have exercised their rights against self-incrimination had they been called to testify, and any comment upon that invocation would have been forbidden by Evidence Code section 913.  (*Ford, supra,* at p. 435.)  Our Supreme Court concluded it was error to grant the new trial motion, since the codefendants were never called upon to invoke their rights against self-incrimination and were "therefore, literally 'available.'"  (*Id.* at p. 440.)  Consequently, the Supreme Court concluded the prosecutor could appropriately comment on the defense failure to call the codefendants as witnesses.  (*Id.* at pp. 435-436.)  In dictum, the Court observed:  "We recognize that a rule permitting comment on a defendant's failure to call witnesses is subject to criticism if applied when the reason for his failure to do so is ambiguous, or if the defendant is simply standing on his right to have the state prove his guilt.  Therefore, the trial court must have discretion to determine when the circumstances of the case are such that comment is not permissible.  When the defendant has taken the stand, however,

16

and offered an alibi defense in which he identifies other persons who could support his testimony, and those witnesses are available and subject to subpoena, there should be no question but that comment is appropriate and permissible." (*Id.* at p. 447.)

In *Frohner,* defense counsel attempted to subpoena an informant who participated in undercover drug buys from the defendant. (*Frohner, supra,* 65 Cal.App.3d at pp. 100-101.) The informant testified for the prosecution at the preliminary hearing but could not be found for trial. (*Id.* at p. 101.) The prosecution had a duty to make a reasonable effort to locate the informant, but made little effort to do so, despite numerous requests from the defense. (*Id.* at pp. 100-102.) During closing argument, the prosecutor challenged the defendant's entrapment defense, noting the defense failed to call the informant as a witness. (*Id.* at pp. 108-109.) The court of appeal found the prosecutor's comment was improper because he knew the informant could not be served by subpoena; thus, his "only apparent reason for the comment was an improper one: to suggest to the jury that defendant had purposely failed to call [the informant] as a witness." (*Id.* at p. 109.)

In *Stankewitz*, the prosecutor called only one of four witnesses to a murder. (*Stankewitz, supra,* 51 Cal.3d at p. 102.) In closing argument, defense counsel commented: " 'And I think that the fact that those people are absent when they are available is something that you should give great consideration to.' " (*Ibid.*) The prosecutor objected that there was no evidence that these witnesses were available. (*Ibid.*) The trial court sustained the objection. (*Ibid.*) The Supreme Court concluded: "The prosecutor's objection was properly sustained. Nothing in the record indicated whether [the other three witnesses] were available. It is axiomatic that counsel may not state or assume facts in argument that are not in evidence." (*Ibid.*) The *Stankewitz* court then distinguished *Ford*, stating: "There, we held that a codefendant who has not actually exercised his privilege against self-incrimination is not unavailable and therefore the prosecutor did not err in commenting on defendant's failure to call several codefendants who might have substantiated his alibi defense. *Ford* does not, however, permit the

17

prosecutor or defense counsel to state as a fact that a codefendant is available as a witness when there is no evidence to substantiate the statement." (*Ibid.*)

From *Ford* and *Frohner*, we glean that prosecutorial misconduct may occur when a defendant testifies and identifies a specific witness who can potentially exculpate him, and the prosecutor comments on the defense's failure to call that witness, knowing that the witness is unavailable. (*Ford, supra,* 45 Cal.3d at p. 447; *Frohner, supra,* 65 Cal.App.3d at pp. 108-109.) From *Stankewitz*, we take the principle that a party is prohibited from asserting facts that are not supported by the evidence. (*Stankewitz, supra,* 51 Cal.3d at p. 102.) None of these cases hold that a prosecutor who argues the defense failed to call a logical witness has the burden of demonstrating the witness was available or would be expected to provide favorable testimony. Defendant's reliance on *Ford*, *Frohner*, and *Stankewitz* is unavailing.

Defendant argues the prosecutor's comments sparked a missing witness inference, thereby shifting the burden of proof from the prosecution to the defense. We are not persuaded. Our Supreme Court has repeatedly recognized that " '[a] distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and . . . an improper statement that a defendant has a duty to produce evidence, or a duty or burden to prove his or her innocence.' " (*People v. Steskal* (2021) 11 Cal.5th 332, 352; see also *People v. Bennett* (2009) 45 Cal.4th 577, 596 [comments do not impermissibly shift the burden of proof when the prosecutor does not "state or imply that defendant had a duty to produce evidence"].) Applying this distinction, the high court has routinely rejected claims of misconduct where the prosecutor merely commented on the lack of evidence offered by the defense or the defendant's failure to call logical witnesses. For example, in *People v. Ratliff* (1986) 41 Cal.3d 675, the court concluded the prosecutor had not engaged in misconduct when he stated, " 'Now is there any evidence on the other side? Any evidence at all? None has been presented to you. Absolutely zero has been presented to you by [the defendant] and his attorney.' " (*Id.* at

18

p. 691.)  In *People v. Johnson* (1989) 47 Cal.3d 1194, overruled on other grounds in *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1174, there was no error where the prosecutor said:  " 'Ladies and gentlemen, you have now heard the entirety of the case . . . . Obviously, if there has been some or is some defense to this case, you'd either have heard it by now or for some reason nobody's talking about it.' "  (*Id.* at p. 1236.)  In *People v. Morris* (1988) 46 Cal.3d 1, disapproved on other grounds by *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5, the prosecutor did not engage in misconduct when he argued there was " 'not a shred of evidence to suggest that anybody else did the killing,' " and when he urged the jury to, " 'put yourself in the position of being a defendant and you can bet your boots that if you had anything to offer by way of evidence, by way of alibi, that you would offer it,' " adding, " 'You don't have it.' "  (*Id.* at p. 36.)  In each of these cases, the prosecutor made no reference to the defendant's decision not to testify, but instead permissibly commented on the defendant's failure to offer any material evidence to support his asserted defenses.  (See *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 ["As for the prosecutor's reference to witnesses not called, it is neither unusual nor improper to comment on the failure to call logical witnesses"].)  So too here.  The prosecutor did not comment on defendant's decision not to testify or suggest that defendant had the burden of presenting evidence to prove his innocence.  The prosecutor merely responded to the asserted defense that another gang member may have shot J.R., by pointing out that there was no evidence to support that theory.  There was no misconduct.

C.      *Sentencing Discretion*

Defendant's sentence included an enhancement of 25 years to life for personal and intentional discharge of a firearm causing great bodily injury or death under section 12022.53, subdivision (d).  Defendant argues remand is required because the trial court failed to recognize its discretion to strike the greater firearm enhancement under section

19

12022.53, subdivision (d) and impose a lesser firearm enhancement under subdivision (b) or (c). Defendant's argument lacks merit.

### a. Additional Background

As noted, the jury found true allegations that defendant personally and intentionally discharged a firearm causing death. (§ 12022.53, subds. (c)-(d).) Prior to sentencing, defendant filed a sentencing memorandum asking that the trial court stay the sentences for the firearm enhancements. The trial court appears to have interpreted defendant's request as encompassing an invitation to strike or dismiss the firearm enhancements.

During the sentencing hearing, the trial court expressly acknowledged its discretion to strike or dismiss the firearm enhancements entirely, strike or dismiss the punishments on the enhancements, or strike a greater firearm enhancement (e.g., § 12022.53, subd. (d)) and impose a lesser included one (e.g., § 12022.53, subds. (b) or (c)). The trial court declined to exercise this discretion, citing defendant's criminal record, history of poor performance in custody, and the vicious and senseless nature of the crime. The trial court explained: "It appears to me that imposing anything short of the applicable enhancement and punishment in [s]ubdivision (d) would ignore or distort an accurate reflection of his criminal conduct, and it would minimize the significant danger he poses to society because it would significantly reduce his period of imprisonment." Accordingly, the trial court imposed an enhancement of 25 years to life under section 12022.53, subdivision (d) and stayed sentence on the remaining enhancements. (§ 12022.53, subd. (f).)

### b. Analysis

Section 12022.53 provides three different sentence enhancements for the personal use of a firearm in the commission of enumerated offenses: a 10-year enhancement for the personal use of a firearm (§ 12022.53, subd. (b)); a 20-year enhancement for the personal and intentional discharge of a firearm (§ 12022.53, subd. (c)); and a 25-year-to-

20

life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).  Section 12022.53, subdivision (h), in effect at the time of defendant's December 2019 sentencing, authorizes the trial court to strike or dismiss an enhancement in the interest of justice pursuant to section 1385. Defendant contends the trial court failed to recognize its discretion to strike the 25-year-to-life enhancement under subdivision (d) and impose a lesser enhancement of 10 years under subdivision (b) or 20 years under subdivision (c).  The record plainly belies defendant's contention.

Defendant's argument for remand rests on *People v. Morrison* (2019) 34 Cal.App.5th 217 (*Morrison*), in which the court held that section 12022.53, subdivision (h) allows a trial court, in the exercise of its discretion, to strike a greater firearm enhancement and impose an uncharged lesser enhancement in the interests of justice pursuant to section 1385.  (*Morrison, supra,* at pp. 220-223.)  Defendant's reliance on *Morrison* is misplaced.[12]  There, the defendant was charged with a single firearm enhancement under section 12022.53, subdivision (d), which the jury found true. (*Morrison, supra,* at p. 221.)  The court concluded that the trial court had discretion to impose a lesser, uncharged firearm enhancement under section 12022.53, subdivision (b)

---

[12]  Several courts of appeal have disagreed with *Morrison*'s reasoning, and the scope of the trial court's discretion to substitute a lesser uncharged firearm enhancement for a greater firearm enhancement is currently pending before the California Supreme Court. (See *People v. Tirado* (2019) 38 Cal.App.5th 637, 643, review granted November 13, 2019, S257658 ["Nothing in the plain language of sections 1385 and 12022.53, subdivision (h) authorizes a trial court to substitute one enhancement for another"]; see also *People v. Garcia* (2020) 46 Cal.App.5th 786, 793-794, review granted June 10, 2020, S261772 [following *Tirado* and holding that § 12022.53, subd. (h) does not grant trial courts discretion to substitute lesser included firearm enhancements].)  We need not address this split in authority, because the present case does not involve the imposition of uncharged lesser enhancements.

or (c) "as a middle ground to a lifetime enhancement under section 12022.53, subdivision (d), if such an outcome was found to be in the interests of justice under section 1385." (*Morrison, supra,* at p. 223.) The case was remanded because nothing in the record indicated that the trial court understood this option was available, and, at the time of sentencing, "no published case had held an uncharged lesser firearm enhancement could be imposed in lieu of an enhancement under section 12022.53, subdivision (d) in connection with striking the greater enhancement." (*Id.* at p. 224.) Significantly, the *Morrison* court explicitly limited its holding to "cases where those enhancements have not been charged in the alternative and found true." (*Id.* at p. 225.) This is not such a case.

Unlike the defendant in *Morrison*, defendant was charged with firearm enhancements under section 12022.53, subdivisions (b), (c), and (d), each of which was found true. Had the trial court exercised its discretion to strike or dismiss the 25-year-to-life enhancement under subdivision (d), the court could have then considered whether to impose one of the lesser enhancements under subdivisions (b) or (c). (See § 12022.53, subd. (f) ["If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment].) This was clearly the state of the law at the time of sentencing, as the *Morrison* court acknowledged some eight months earlier, when, in laying the groundwork for the novel issue raised in that case, the court explained: "In a case where the jury had also returned true findings of the lesser enhancements under section 12022.53, subdivisions (b) and (c), the striking of an enhancement under section 12022.53, subdivision (d) would leave intact the remaining findings, and an enhancement under the greatest of those provisions would be mandatory unless those findings were also stricken in the interests of justice." (*Morrison, supra,* 34 Cal.App.5th at p. 851; see also *People v. McDaniels* (2018) 22 Cal.App.5th 420, 423-425 & fn. 2, 427-428, [noting that under section 12022.53, subdivision (h) and section 1385, the trial court had the

22

discretion to strike a firearm enhancement under section 12022.53, subdivision (d), and then either impose time for one of the stayed lesser firearm enhancements under subdivisions (b) and (c) or strike them as well].)

Nothing in the record suggests the trial court was unaware that striking the 25-year-to-life enhancement would leave the 20- and 10-year enhancements on the table. To the contrary, the record affirmatively demonstrates that the trial court was aware of its discretion but declined to exercise it. No remand is required.

D.    *Fines and Fees*

Finally, defendant challenges the imposition of various fines and fees, including: a $10,000 restitution fine (§ 1202.4), an $80 court operations assessment (§ 1465.8), a $60 conviction assessment fee (Gov. Code, § 70373), a $453 main jail booking fee (Gov. Code, § 29550.2), a $90 main jail classification fee (Gov. Code, § 29550.2), and $31,012 in direct victim restitution (§ 12024, subd. (f)).[13] Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), defendant argues the trial court violated his constitutional rights by imposing these fines and fees without determining his ability to pay. The People respond that defendant forfeited his *Dueñas* challenge by failing to object in the trial court. We agree with the People.

The decision in *Dueñas* was issued on January 8, 2019. (*Dueñas, supra,* 30 Cal.App.5th 1157.) Defendant was sentenced some 11 months later, on December 13, 2019. Defendant made no mention of *Dueñas* or ability to pay in the trial court, and thus forfeited this challenge. (See, e.g., *People v. Avila* (2009) 46 Cal.4th 680, 729 [rejecting argument that defendant was exempted from forfeiture because restitution fine amounted to an unauthorized sentence based upon his inability to pay].) That defendant's ability to pay claims are constitutional in character does not alter application of the forfeiture

---

[13] The trial court also imposed and suspended a $10,000 parole revocation fine. (§ 1202.45.)

doctrine.  (See *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [constitutional exception to forfeiture rule did not apply to claim concerning failure to obtain express waiver of an ability to pay hearing]; *In re Sheena K.* (2007) 40 Cal.4th 875, 880-881 [noting longstanding rule that a constitutional right may be forfeited in criminal proceedings by " ' "failure to make timely assertion of the right before a tribunal having jurisdiction to determine it" ' "].)  We therefore conclude that defendant has forfeited his *Dueñas* claim.

## III.  DISPOSITION

The judgment is affirmed.




/S/

_____

RENNER, J.




We concur:


/S/

_____

DUARTE, Acting P. J.


/S/

_____

KRAUSE, J.



24